**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Senior Airman MARCUS A. MANCINI**
**United States Air Force**

**ACM 38783**

**7 November 2016**

Sentence adjudged 17 October 2014 by GCM convened at Beale Air Force Base, California. Military Judge: Todd E. McDowell.

Approved Sentence: Dishonorable discharge, confinement for 7 years, forfeiture of all pay and allowances, and reduction to E-1.

Appellate Counsel for Appellant: James S. Trieschmann, Esquire (argued) and Captain Annie W. Morgan.

Appellate Counsel for the United States: Lieutenant Colonel Roberto Ramirez (argued); Major Mary Ellen Payne; Major J. Ronald Steelman; and Gerald R. Bruce, Esquire.

Before

MAYBERRY, DUBRISKE, and SPERANZA
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

DUBRISKE, Senior Judge:

Contrary to his pleas, Appellant was found guilty by a general court-martial consisting of officer members of three specifications of sexual assault, two specifications of abusive sexual contact, and one specification of indecent visual recording, in violation of Articles 120 and 120(c), UCMJ, 10 U.S.C. §§ 920, 920(c). These offenses encompassed two separate victims, Senior Airman (SrA) CC and Ms. AE. Appellant was acquitted of additional sexual misconduct with a third victim, Ms. BM, but was convicted of assaulting

Ms. BM during a sexual encounter in violation of Article 128, UCMJ, 10 U.S.C. § 928. The panel sentenced Appellant to a dishonorable discharge, seven years of confinement, forfeiture of all pay and allowances, and reduction to E-1. The convening authority approved the adjudged sentence.

Appellant raises three assignments of error on appeal. He first alleges the military judge abused his discretion in admitting evidence derived from the search and seizure of Appellant's cell phone. Based on Appellant's motion, the court heard oral argument on this issue on 18 August 2016. Appellant's final two claims of error surround the military judge's admission of charged offenses as propensity evidence. After the filing of briefs, the court specified an issue requesting the parties address the impact of the military judge's decision to admit propensity evidence in light of our superior court's recent decision in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016).

Appellant also requested this court consider, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), numerous allegations of error. We address three of these below. Having considered the remainder, we find they do not merit either relief or further analysis here. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

We find the military judge did not abuse his discretion in admitting incriminating evidence obtained by the Government from Appellant's cell phone. Although the initial seizure of Appellant's cell phone was improper, the inevitable discovery doctrine and good-faith exception cause us to decline to employ the exclusionary rule in this case.

However, we find prejudicial error from the military judge's admission of the charged sexual offenses as propensity evidence. We conclude this error was harmless beyond a reasonable doubt as to the offenses involving SrA CC, but that it was not harmless beyond a reasonable doubt for the specifications of sexual assault and abusive sexual contact involving Ms. AE. We therefore dismiss the two specifications of the Additional Charge. Our dismissal of these specifications require us to return Appellant's case to the convening authority for a rehearing.

*Background*

Appellant and SrA CC met at technical training and soon became best friends. They both were assigned to Beale Air Force Base, California, for their first duty assignment, so their friendship continued. In the summer of 2012, their relationship turned sexual in nature. However, SrA CC decided in December 2012 to terminate the sexual aspect of their relationship. SrA CC and Appellant engaged in consensual sexual activity for the last time in December 2012. SrA CC believed Appellant understood her desire to end their sexual relationship after this encounter.

In mid-January 2013, SrA CC, Appellant, and friends went out for dinner and drinks. Around 0130 hours the next morning, SrA CC returned with Appellant to his apartment. SrA CC did not feel extremely intoxicated when she arrived, but noted she would not have driven a vehicle due to her level of intoxication. She was, however, very tired as she had been up for approximately 20 hours and went to lie down in Appellant's bed around 0230 hours to go to sleep. SrA CC believes she went to sleep on her right side almost immediately after lying down.

SrA CC later woke up in the same position as she had gone to sleep earlier. She immediately saw a flash of light on the wall of Appellant's bedroom. Although initially disoriented, SrA CC quickly realized her pants were pulled down and there was something wet on her exposed buttocks. SrA CC then saw a second flash of light and felt Appellant touching her genitalia. As SrA CC started to move, Appellant pulled her pants back up and covered her up with a blanket.

SrA CC got up from Appellant's bed, grabbed her cell phone, and went to the bathroom. As she was getting up, Appellant asked her if she was okay while patting her on the back. SrA CC noticed when she got to the bathroom that her buttocks were sticky with what appeared to be semen. She also had physical indications someone had recently engaged in sexual intercourse with her.

Because she had no memory of engaging in sexual intercourse with Appellant, SrA CC became upset, immediately left Appellant's room, and went to talk with one of Appellant's roommates. SrA CC began crying immediately when speaking to the roommate and provided some details of what happened in Appellant's room. Appellant texted SrA CC at some point after she left his room to ask her if he had heard SrA CC crying. When SrA CC stated she was not crying, Appellant responded with "Oh [thank] god. I was scared. Thought you had the wrong idea about waking up the way you did . . . ." It was decided based on input from the roommate that SrA CC would give Appellant a chance to explain what happened instead of immediately contacting law enforcement to report the incident.

The next day, Appellant and SrA CC discussed what had occurred in Appellant's bedroom. Appellant informed SrA CC they had consensual sexual intercourse during the evening. When asked about the flash of light, Appellant advised the light came from the flashlight on his cell phone.

Approximately a week later, SrA CC decided to confront Appellant about the incident via text message. As she now believed the flashes of light she saw came from a camera flash, SrA CC informed Appellant she was awake at some point when he took pictures of her. Appellant apologized and informed SrA CC he should not have taken the pictures without talking with her first. He advised he would erase the pictures.

Shortly after this conversation, SrA CC was interviewed by the Air Force Office of Special Investigations (AFOSI).[1] SrA CC agreed to engage Appellant by text message. Appellant again apologized for his actions, stating SrA CC "busted [him] doing something dumb." When confronted with allegations he had sex with SrA CC when she was asleep, Appellant advised SrA CC that she was moving and kissed him during sex.

A few days later, SrA CC engaged Appellant in a pretext phone call while an AFOSI agent listened to the conversation. Appellant admitted to taking pictures of SrA CC's buttocks and confirmed he had ejaculated on her at some point during the evening. When SrA CC challenged Appellant that she was asleep during this time, Appellant responded that he knew and was "dumb" for taking the pictures. Appellant also claimed they engaged in sexual intercourse two times earlier in the morning before he took photographs, and that SrA CC appeared to be physically and verbally engaged during these encounters. SrA CC immediately broke down after hearing the full extent of Appellant's sexual activity with her during this incident, so the pretext phone call was terminated.

Appellant's cell phone was eventually seized by AFOSI. A forensic examination of the phone by the Defense Computer Forensic Laboratory (DCFL) identified photos of SrA CC's exposed genitalia, as well as photos of Appellant digitally penetrating SrA CC's anus. The forensic examination also captured text messages where Appellant informed SrA CC he had photographed her while she was asleep.

An examination of Appellant's text messages by a member of the legal office identified two additional victims, Ms. BM and Ms. AE. The text messages also allowed the Government to identify another witness who testified, pursuant to Mil. R. Evid. 404(b), that Appellant had reported to her his fantasy about having control over a drugged or unconscious woman to allow him to do whatever he pleased with her sexually.

Additional facts necessary to resolve the assignments of error are provided below.

*Search and Seizure of Appellant's Cell Phone*

After reviewing SrA CC's sworn statement and the evidence from pretext conversations with Appellant, AFOSI interviewed Appellant regarding this incident on 4 February 2013. Appellant immediately invoked his Article 31, UCMJ, 10 U.S.C. § 831, rights. Except for a 20-minute period where Appellant's fingerprints and picture were taken, Appellant was left alone in the interview room for nearly two hours, with only a single interaction with AFOSI agents informing him they were waiting on paperwork.

---

[1] The Air Force Office of Special Investigations (AFOSI) became involved when Senior Airman (SrA) CC informed her supervisor about the assault. It appears SrA CC had the mistaken belief based on her interaction with the wing's sexual assault response coordinator that her immediate supervisor could be notified without triggering the requirement for law enforcement involvement.

While Appellant was detained, the AFOSI Detachment Commander, Special Agent (SA) DB met with the military magistrate and the Chief of Military Justice from the base legal office to request search authorization for Appellant's phone.[2] The military magistrate and the Chief of Military Justice, whose advice the military magistrate considered and ultimately relied upon, initially determined the evidence AFOSI presented was insufficient to establish probable cause as it related to the seizure of text messages between Appellant and SrA CC. Thus, the military magistrate gave no authorization to search at that time.

After the initial denial of authorization, the Chief of Military Justice reviewed the actual text message conversations between Appellant and SrA CC. After doing so, he informed SA DB by email that they would be "good to go" for the search and arranged a telephonic conference with the military magistrate. The military magistrate eventually granted oral search authorization, but the authorization was "limited in scope" in that they were allowed to search Appellant's cell phone for photos and text messages related to the alleged sexual assault of SrA CC.

At some point after receiving the email from the Chief of Military Justice, but prior to the second meeting with the military magistrate, SA DB informed one of his agents they had received the necessary search authorization for Appellant's phone.[3] The AFOSI agents interviewing Appellant then informed him that search authorization had been granted and asked Appellant where his cell phone was located. Appellant informed the agents that it was in his personal vehicle located in a parking lot near his work center. AFOSI had no knowledge of the cell phone's location prior to this questioning.[4] Appellant's cell phone was then seized by AFOSI prior to obtaining the military magistrate's actual verbal authority to seize the phone.

On 6 February 2013, SA DB signed an affidavit meant to record what was relayed to the military magistrate in support of the request for search authorization granted two days prior. Although noting that the search authorization form appeared broader in scope than the authorization he had orally granted, the magistrate signed the authorization as

[2] Special Agent (SA) DB remembered almost nothing about the critical conversations with the military magistrate, Chief of Military Justice, or his case agent. He could not recall whether he had one or two meetings with the military magistrate, and was unable to provide any significant details about these meetings. He also could not remember the name of the AFOSI agent he notified when he believed he had obtained search authorization for Appellant's cell phone.

[3] Based on our review of the email from the Chief of Military Justice to SA DB, we do not see how SA DB, as a competent AFOSI agent, could have concluded he actually possessed search authority prior to the second meeting with the military magistrate. This conclusion is supported by the fact that SA DB never corrected his misunderstanding of the facts with the interrogating agent even though he had this second meeting scheduled with the military magistrate about the search authorization.

[4] Appellant had been "patted down" prior to entering the secure AFOSI facility, so agents did not believe Appellant had the cell phone on his person when they questioned him about its location. The agents were also generally aware cell phones were not permitted at Appellant's workplace given it was a secure facility.

drafted, relying on AFOSI and the legal office to enforce the search authorization's parameters.[5]

After receiving both the verbal and written search authorizations, AFOSI extracted all data from the device using local forensic data examination equipment. This data, which included text messages between Appellant and other individuals, was eventually provided to the trial counsel analyzing Appellant's case. Trial counsel identified potential witnesses from this data, and requested AFOSI complete follow-up interviews.

In addition to this examination of data on Appellant's cell phone by AFOSI, DCFL was asked to complete a comprehensive forensic data examination. The DCFL examiner reviewed the search authorization signed by the magistrate and an AFOSI internal request form to define the scope of the examination. As these documents generally sought data on Appellant's phone related to a sexual assault, including images, text messages, and emails, DCFL examined all data on Appellant's phone. This examination included extracting text messages other than those between Appellant and SrA CC.

DCFL's examination identified photographs of Appellant sexually assaulting SrA CC, as well as incriminating text messages that had been previously viewed by AFOSI and used in support of the request for search authorization. In reviewing the data extracted by DCFL, AFOSI found additional incriminating photographs of SrA CC taken by Appellant the same evening which were not identified by DCFL during their initial examination.

During pretrial litigation, the Defense filed a motion in limine to exclude evidence from Appellant's cell phone as it was taken in violation of the United States Constitution and various provisions of the Military Rules of Evidence. Appellant also requested the military judge dismiss the charges and specifications involving victims other than SrA CC, arguing these offenses were derived from the unlawfully obtained cell phone.

The military judge issued a 20-page written ruling containing thorough findings of fact and conclusions of law. We adopt the military judge's factual findings as they are not clearly erroneous. *See United States v. Robinson*, 58 M.J. 429, 433 (C.A.A.F. 2003).

The military judge determined that AFOSI violated Appellant's Article 31, UCMJ, rights when they questioned him about the location of his cell phone. However, the military judge determined that when Appellant's cell phone was improperly seized, it was inevitable that law enforcement would eventually gain the necessary legal authority to seize the phone in the near future. The military judge further concluded that the AFOSI agents relied in objective good faith that the oral search authority had been granted when they were notified by SA DB. Therefore, the military judge concluded that the phone was lawfully seized

---

[5] The military judge found no evidence that anyone within AFOSI intentionally drafted the language to be broader in scope than the actual verbal authorization. We accept this finding in completing our review.

under the circumstances. The military judge also found the search of the contents of the phone was lawful as it applied to photographs and text messages.

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Thompson*, 63 M.J. 228, 230 (C.A.A.F. 2006); *see also United States v. Harrell*, 75 M.J. 359 (C.A.A.F. 2016). We will affirm a military judge's findings of fact unless the findings are clearly erroneous, and we review conclusions of law therefrom de novo. *United States v. Rader*, 65 M.J. 30, 32 (C.A.A.F. 2007). The evidence is considered "in the light most favorable to the prevailing party." *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F. 1996) (quotation marks omitted). An abuse of discretion occurs when (1) findings are clearly erroneous, (2) an erroneous view of the law guides a decision, or (3) the decision is not one of the possible outcomes arising from the facts and law. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008).

*1. Seizure of Appellant's Phone*

The military judge determined, at the time of the initial seizure, that the military magistrate had not yet granted verbal search authorization to secure Appellant's phone. Nevertheless, the military judge concluded AFOSI would have inevitably discovered Appellant's phone and that they were relying in objective good faith that the magistrate had already granted oral search authorization when the phone was seized.

We agree with the military judge that at the time Appellant's phone was seized, there was no authorization, oral or written, from the military magistrate.[6] Having determined this, we move to the exceptions for a warrantless search.

Improperly obtained evidence is admissible if it inevitably would have been discovered through independent, lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Wallace*, 66 M.J. 5, 10 (C.A.A.F. 2008). Mil. R. Evid. 311(c)(2) covers this exception to the exclusionary rule and states, "Evidence that was obtained as a result of an unlawful search or seizure may be used when the evidence would have been obtained even if such unlawful search or seizure had not been made." The "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Nix*, 467 U.S. at 446. The purpose of this doctrine is to ensure

---

[6] The good faith exception requires reliance on an authorization from a neutral and detached magistrate. *United States v. Hoffmann*, 75 M.J. 120, 127 (C.A.A.F. 2016). In this case, no such authorization existed when Appellant's phone was seized; thus, no good faith reliance could have existed. Although the agent executing the authorization was erroneously informed that such authorization had been granted when he executed the seizure, the good faith belief was based on representations from another AFOSI agent, not a neutral and detached magistrate. We find it unpersuasive that SA DB could have in good faith informed his subordinates that search authorization existed when it had not yet been granted by the magistrate. Regardless, this finding does not impact our disposition of this case based on inevitable discovery.

the exclusionary rule does not "put the police in a worse position than they would have been in absent any error or violation." *Id.* at 443.

For the inevitable discovery doctrine to apply, the prosecution must establish, by a preponderance of the evidence, that "when the illegality occurred, the Government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence and that the evidence would inevitably have been discovered in a lawful manner had not the illegality occurred." *United States v. Dease*, 71 M.J. 116, 122 (C.A.A.F. 2012) (quoting *United States v. Kozak*, 12 M.J. 389, 394 (C.M.A. 1982)). "'[M]ere speculation and conjecture' as to the inevitable discovery of the evidence is not sufficient when applying this exception." *United States v. Wicks*, 73 M.J. 93, 103 (C.A.A.F. 2014) (quoting *United States v. Maxwell*, 45 M.J. 406, 422 (C.A.A.F. 1996)) (alteration in original). The prosecution must prove, based on demonstrated historical facts, that the evidence would have been discovered even if the illegal search had not occurred, through an alternative means untainted by the illegality. *Nix*, 467 U.S. at 443 n.5. This exception is only applicable "[w]hen the routine procedures of a law enforcement agency would inevitably find the same evidence." *Wicks*, 73 M.J. at 103 (quoting *United States v. Owens*, 51 M.J. 204, 204 (C.A.A.F. 1999)) (alteration in original).

Applying the inevitable discovery doctrine here, we find Appellant's phone would have been seized in a lawful manner. The Government was already seeking search authorization from the military magistrate for Appellant's cell phone at the time the phone was improperly seized. The authorization was supported by SrA CC's statements about the incident, as well as text messages which were obtained prior to Appellant's interview with AFOSI. While the military magistrate initially declined to grant AFOSI search authorization, it is clear from the record his decision was primarily caused by SA DB's inability to recall specific details regarding the text messages.[7] AFOSI did not obtain any additional information after the initial discussion with the military magistrate, but instead was finally able to articulate relevant facts connecting text messages likely found on Appellant's cell phone to AFOSI's criminal investigation. These factual matters more than exceeded the substantial basis standard needed to uphold the military magistrate's decision to grant search authorization based on probable cause. Thus, based on the facts of this case, we are confident that when the illegality occurred, the Government was actively pursuing leads that would have inevitably led to the lawful seizure of Appellant's phone.

On a related matter, Appellant argues the search authorization for his cell phone was overbroad as it failed to specifically identify the location to be searched. Appellant further claims the Government would have never located his cell phone absent the violation of his

---

[7] The magistrate testified during the motion hearing that he would have initially granted search authorization for photographs of SrA CC contained on Appellant's cell phone. His initial concern was solely with the text message evidence being sought by AFOSI.

Article 31, UCMJ, rights in compelling him to disclose the location of his cell phone.[8] While we agree with Appellant that the Government should have identified the locations to be searched, we do not believe this omission is constitutionally fatal in this case. The military magistrate testified he would have granted search authorization of Appellant's person, as well as any other area on the military installation over which the military magistrate had jurisdiction, including Appellant's personal vehicle parked on the installation and his workplace.

Further, AFOSI agents testified they knew from their experience that the phone would either be on Appellant's person, at his home, or in his car. Given the ease in which electronic data can be deleted by users, including through remote methods, we are confident Appellant would have been detained at AFOSI until the necessary authorization to seize the cell phone from his personal vehicle and workplace had been obtained. We believe this tactic would have been legally authorized given the strong evidence of probable cause in this case. *Cf. United States v. Hoffman*, 75 M.J. 120, 125 (C.A.A.F. 2016) (discussing the requirement for probable cause before freezing a crime scene to procure search authorization). As we are confident Appellant's phone would have eventually been secured through lawful measures in this case, we decline to suppress the seizure of his phone.

*2. Search of Appellant's Phone*

Having concluded Appellant's phone was lawfully seized, we now examine the lawfulness of the searches conducted on the phone. The military judge determined there were three separate searches of the phone: (1) the initial extraction of all images, text messages, contacts, call logs, calendar, notes, and tasks conducted by AFOSI; (2) DCFL's forensic analysis of the entire phone based on the military magistrate's search authorization and request by AFOSI; and (3) the review of the data extracted during both the AFOSI and DCFL searches by trial counsel.

The first search identified by the military judge—the forensic extraction conducted by AFOSI—occurred on 4 March 2013. The military judge found that there was no evidence the AFOSI agent who conducted this search knew anything about the scope of the search authorization. The military judge further determined that this search exceeded the scope of the magistrate's authorization because it extracted all images, texts, contacts, calls, calendar entries, and notes from Appellant's phone, when the search authorization only permitted the search of texts and images relating to the sexual assault of SrA CC. Thus, only information relating to the images and text messages was lawfully obtained.

---

[8] AFOSI's questioning as to the location of Appellant's cell phone after he had invoked his right to remain silent and requested counsel was improper. *See United States v. Hutchins*, 72 M.J. 294, 298 (C.A.A.F. 2013). This violation, however, does not prohibit our use of the exclusionary rule in analyzing Appellant's case.

We are troubled by the lack of awareness the agent possessed about the search authorization when downloading data from Appellant's phone. There was no evidence the agent reviewed the search authorization before conducting the extraction, so we question how the agent could have acted in good-faith reliance on the search authorization. However, we need not address the lawfulness of AFOSI's extraction of data given our belief the search of Appellant's cell phone data by DCFL was performed in good faith.

### A. Search by DCFL

On 22 March 2013, DCFL received Appellant's cell phone along with a request to analyze it "for all, but not limited to, the following: Any captured image or video of any female in any notably nude depiction/position for the month of January 2013." The request for forensic analysis submitted by AFOSI also included the search authorization signed by the military magistrate which sought "data [from Appellant's cell phone] related to a sexual assault allegation."

The forensic examiner, Mr. JB, reviewed the request from AFOSI, as well as the authorization issued by the military magistrate. Mr. JB noted the search authorization was "not super specific" and that nothing in the search authority was tied to specific people, images, or a particular timeframe. As such, he interpreted the scope of the search to be broad, giving him the authority to extract and examine all data stored on the phone. Mr. JB then extracted data from Appellant's cell phone including audio files, images and videos, calls, chats, emails, and text messages. All of the data obtained from the device was sent back to AFOSI to determine what information was actually relevant to their investigation. Mr. JB testified the data is returned to the requesting agency for review as the examiner is not an investigator and, therefore, is not aware of how certain data may be relevant to an individual investigation.[9]

The military judge found the examiner conducting the search at DCFL acted in good-faith reliance on the search authorization. He further concluded there was no evidence AFOSI agents had deliberately misled the examiner regarding the scope of the search authorization and that the DCFL examiner did not act recklessly when relying on the terms of the search authorization. As such, the military judge did not suppress the evidence resulting from this search of Appellant's phone.

On appeal, Appellant argues the military judge erred in applying the good faith exception because the search authorization was either facially deficient or was the product of false information provided by AFOSI.[10]

---

[9] In fact, in this case, AFOSI agents found additional photographs of SrA CC in the DCFL raw data which were not identified by Mr. JB during his initial review.

[10] In arguing the warrant was deficient, Appellant also notes the warrant commands any search must have been initiated within three days of 4 February 2013, which was the day the magistrate granted verbal search authority. As DCFL did not begin their forensic examination until three months later, Appellant argues the search must be suppressed. We

The good faith exception permits the admission of evidence, which although unlawfully obtained, was the result of the good-faith reliance of law enforcement agents on a search authorization. The good faith exception permits the use of evidence obtained from an unlawful search and seizure if:

> (A) the search or seizure resulted from an authorization to search, seize or apprehend issued by an individual competent to issue the authorization under Mil. R. Evid. 315(d) or from a search warrant or arrest warrant issued by competent civilian authority;
>
> (B) the individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause; and
>
> (C) the officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith is to be determined using an objective standard.

Mil. R. Evid. 311(c)(3).

> [T]he good-faith exception will not apply when part of the information given to the authorizing official is intentionally false or given with "reckless disregard for the truth." It will also not apply where "no reasonably well trained officer should rely on the warrant." The exception also will not apply when the "affidavit [is] 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Finally, it will not apply when the authorization "may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*United States v. Lopez*, 35 M.J. 35, 41–42 (C.M.A. 1992) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)).

---

do not share Appellant's interpretation of the search authorization, and only believe the initial seizure of the phone was required to be completed within three days. Regardless, we do not believe any error regarding the date on the authorization requires suppression of the evidence seized from Appellant's cell phone. *See generally, United States v. Gerber*, 994 F.2d 1556, 1560 (11th Cir. 1993) (completing a search shortly after the expiration of a search warrant does not rise to the level of a constitutional violation and cannot be the basis for suppressing evidence seized so long as probable cause continues to exist, and the Government does not act in bad faith).

We find the military judge did not abuse his discretion in applying the good faith exception to the search by DCFL. The examiner testified he reviewed the search authorization prior to conducting his search. The terms of that authorization were not narrow, which resulted in Mr. JB believing he was authorized to search for "anything associated with the alleged sexual assault." Examining all of the facts and circumstances, we likewise conclude the search resulted from an authorization granted by a military magistrate, the magistrate had a substantial basis for concluding that probable cause existed, and the examiner reasonably, objectively, and with good faith relied on the authorization in conducting his search of data from Appellant's cell phone. While the search authorization could have been clearer, we believe a reasonably well trained officer would have relied on the search authorization to secure all text message conversations from Appellant's cell phone.

We also reject Appellant's argument the search authorization was the product of false or misleading information. The military judge found otherwise, and we believe his findings on this question were not clearly erroneous. In supporting this conclusion by the military judge, we note the military magistrate testified that while the search authorization language could be read as somewhat broader than what he orally granted, he was comfortable with the authorization's language when he signed it as it still limited the search authorization to the one sexual assault allegation involving Appellant and SrA CC.

### B. Examination of DCFL Data by Trial Counsel

The final question regarding the search of Appellant's cell phone surrounds trial counsel's examination of all text messages located on the phone. In addition to securing incriminating text message conversations between Appellant and SrA CC, trial counsel identified two additional victims, Ms. BM and Ms. AE. The Government was also able to identify another witness who testified, pursuant to Mil. R. Evid. 404(b), that Appellant had reported to her his fantasy about having control over a drugged or unconscious woman to allow him to do whatever he pleased with her sexually. While not conceding any portion of the search was lawful, Appellant argues the review of text messages by the Government should have been limited to only conversations between Appellant and SrA CC.

In analyzing this issue, the military judge primarily looked at trial counsel's review of data downloaded by AFOSI using a local forensic extraction tool. This data was secured prior to Appellant's phone being sent to DCFL for a full forensic analysis. The military judge noted, however, that the same data secured by AFOSI was eventually obtained by DCFL relying on the military magistrate's written search authority. As we find the AFOSI data initially reviewed by trial counsel would have been inevitably discovered by the Government based on the lawful examination by DCFL, we believe the military judge's analysis remains legally sound whether applied to data captured by AFOSI or DCFL.

The military judge concluded that the review of the data by trial counsel was within the scope of the search authorization. In this light, he determined trial counsel's purpose in examining Appellant's text message conversations was to find information that supported or corroborated the initial allegations made by SrA CC.[11]

We do not believe the military judge abused his discretion on this particular matter. Clearly, the text messages involving SrA CC would have been admissible even under the most restrictive reading of the search authorization suggested by Appellant. Moreover, under the circumstances of this case, it was reasonable for trial counsel to review all text messages on Appellant's phone to find information relevant to the initial allegations made by SrA CC, including communications between Appellant and other persons that were intermixed with conversations involving SrA CC.[12] Trial counsel testified his initial examination of the text message data from Appellant's phone was to identify conversations between Appellant and SrA CC.[13] While the messages used by the Government to secure this additional evidence were transmitted prior to the assault of SrA CC, we do not believe this fact limited trial counsel's review of earlier messages given the relevance of SrA CC's entire relationship with Appellant to the allegations of sexual assault that were currently being evaluated by trial counsel. *See United States v. Richards*, 659 F.3d 527, 538 (6th Cir. 2011) (recognizing the majority of federal courts "have employed the Fourth Amendment's bedrock principle of reasonableness" when examining scope of search). For these reasons, we find the military judge did not abuse his discretion in admitting both direct and derivative evidence obtained from the search of text messages on Appellant's cell phone.

In so holding, we are mindful of our decision in *United States v. Osario*, 66 M.J. 632 (A.F. Ct. Crim. App. 2008), which Appellant references in arguing trial counsel's examination of all text messages was overbroad. In *Osario*, an AFOSI agent, who was unaware of the terms of a search authorization for the appellant's computer, was asked to prepare a forensic mirror image of the computer's hard drive. Once the mirror image was completed, the AFOSI agent began to review thumbnail images of what appeared to be nude persons. The agent opened one of these images to make sure it was not contraband, discovering then what she believed was a photograph of a nude minor. The agent continued

---

[11] Trial counsel testified he did not review the search authorization before reviewing the text messages secured from Appellant's phone. Provided he had done so, we do not believe the broad language in the authorization would have caused him to otherwise limit his search to only conversations between Appellant and SrA CC. Clearly, however, the better course of practice for prosecutors is to review the underlying search authorization prior to examining evidence produced by the search.

[12] DCFL produced a report consisting of only text message conversations between Appellant and SrA CC. This fact, we believe, does not render trial counsel's review of all text message data unreasonable given the language of the search authorization.

[13] The military judge specifically found the reviews of text message data were limited and made with the intent to either corroborate or refute the allegations of SrA CC and were targeted specifically at the text communications which were within the scope of the search authority given by the magistrate. We do not find this factual conclusion to be clearly erroneous.

to open the thumbnails and identified several more images which appeared to depict nude minors.

In suppressing the search, this court first noted the search warrant only authorized the examination of the computer for photographs taken on a single day. Because the agent's search went beyond the date noted in the warrant, this court found the search exceeded the warrant's scope. *Id*. at 636. Moreover, as the agent's stated purpose in examining the images was to determine if they were contraband, this court held the agent should have stopped her search and sought a new authorization for a crime different from the one covered by the operative warrant. *Id*.

*Osario* is distinguishable from the case before us for two reasons. First, unlike the warrant in *Osario*, the terms of the warrant issued by the magistrate were not extremely restrictive. On the contrary, the authorization for Appellant's phone sought "data related to a sexual assault investigation" involving SrA CC. This broader authorization, we believe, encompasses the Government's search of Appellant's cell phone in this case.

Second, we find the text message conversations reviewed by trial counsel in this case were not clear evidence of another "crime" as previously faulted by this court. A number of the messages denote masochistic behavior between Appellant and multiple individuals. However, when read in context with other conversations between Appellant and these individuals, we do not believe it would have been reasonable to conclude from the messages alone that Appellant engaged in additional sexual assaults and, as such, necessitated a second search authorization before continuing to review the data secured by DCFL.

Even had the military judge erred in determining trial counsel's review of all text messages was within the scope of the authorization, we believe the testimony of the witnesses, including the two victims, discovered during the review of Appellant's text messages would have remained admissible. In so holding, we rely on the United States Supreme Court's opinion in *United States v. Ceccolini*, 435 U.S. 268 (1978). There, the Court highlighted the distinction between excluding tangible evidence and the testimony of live witnesses. *Id*. at 277–78. The use of the exclusionary rule to prevent live-witness testimony is used with greater reluctance given the cost is higher in excluding live-witness testimony as opposed to the suppression of an inanimate object. *Id*. at 280. Consequently, "since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." *Id*. at 278.

In evaluating whether to exclude evidence of live-witness testimony derived from unlawful police activity, the Supreme Court set out five factors for courts to consider:

> (1) The degree of free will exercised by the witness in testifying;

(2) The time lapse between the time of the illegal search and the initial contact with the witness, as well as the lapse of time between initial contact and testimony at trial;

(3) The role the illegal law enforcement activity had in obtaining the witness testimony;

(4) The purpose and flagrancy of the law enforcement conduct; and

(5) The cost-benefit analysis, comparing the cost of excluding live-witness testimony and permanently silencing a witness with the beneficial deterrent effect.

*See id*. at 276, 279–80.

While the witnesses would likely not have been discovered absent the Government's search of Appellant's phone, we find the remaining factors point away from the exclusion of witness testimony. The testimony of these witnesses took place over a year after they were identified, and it appears their testimony was the product of their own free will. Moreover, based on the testimony put before the military judge, we do not find the challenged Government conduct in this case was deliberate or flagrant. For these reasons, we would decline to exclude witness testimony in this case.

*Improper Admission of Propensity Evidence*

Appellant next argues the military judge abused his discretion by failing to perform the necessary Mil. R. Evid. 413 analysis on the record before admitting propensity evidence. Appellant also attacks the constitutionality of Mil. R. Evid. 413. In doing so, Appellant acknowledges this rule has repeatedly been found constitutional by our superior court. *See United States v. Schroder*, 65 M.J. 49 (C.A.A.F. 2007); *United States v. Dewrell*, 55 M.J. 131 (C.A.A.F 2001); *United States v. Wright*, 53 M.J. 476 (C.A.A.F. 2000).

After filing of briefs, the court requested the parties address the impact of the military judge's decision to admit propensity evidence involving charged offenses in light of our superior court's recent decision in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016). We now find, after reviewing the briefs of the parties on the specified issue, that Appellant is entitled to relief on specifications involving one of his two sexual assault victims.

In *Hills*, our superior court determined the military judge erred in admitting three charged sexual assault offenses involving a single victim as propensity evidence. In so

holding, the court noted that because the evidence of a charged sexual assault was already admissible to prove the underlying offense, the use of Mil. R. Evid. 413 was error.

> We hold that because the evidence of the charged sexual misconduct was already admissible in order to prove the offenses at issue, the application of Military Rule of Evidence (M.R.E.) 413—a rule of admissibility for evidence that would otherwise not be admissible—was error. Neither the text of M.R.E. 413 nor the legislative history of its federal counterpart suggests that the rule was intended to permit the government to show propensity by relying on the very acts the government needs to prove beyond a reasonable doubt in the same case.

*Hills*, 75 M.J. at 352.

In addition to finding the military judge erred in admitting charged offenses as propensity evidence, the court ruled the military judge's spill-over and propensity instructions were improper as the court members were provided with "directly contradictory statements about the bearing that one charged offense could have on another." *Id*. at 357. In so finding, the court noted it could not determine if "Appellant's right to a presumption of innocence and to be convicted only by proof beyond a reasonable doubt was not seriously muddled and compromised by the instructions as a whole." *Id*. Given the instructional error raised constitutional due process concerns, the court examined the prejudicial effect of the error under the standard of harmless beyond a reasonable doubt.

The Government argues that *Hills* should not be applied to situations like Appellant's case where there are either multiple sexual assault victims or multiple offenses involving the same victim which occur at different times. While our superior court specifically recognized that the purpose of Mil R. Evid. 413 is to address recidivism and, therefore, permits the bolstering of a victim's credibility through the use of evidence from other victims of an accused's sexual misconduct, it does not appear to us the ultimate holding in *Hills* would have been different had the charged offenses involved multiple victims or differing offense dates as found here. We, therefore, decline the Government's invitation to limit *Hills* to its facts.

Moreover, we note the primary defect raised in *Hills* related to the language contained within the propensity and spillover instructions provided to the panel members. As similar instructions faulted by our superior court in *Hills* were given to the court members in this case, it is through this lens that we now examine the impact of the propensity instruction errors in Appellant's case. We apply this more stringent standard of prejudice even if Appellant forfeited review of this issue absent plain error by not objecting to the military judge's instructions at trial. *See United States v. Flores*, 69 M.J. 366, 369

(C.A.A.F. 2011) (stating that prejudice during a plain error review of a constitutional violation is examined under a harmless beyond a reasonable doubt standard).

We review de novo whether a constitutional error was harmless beyond a reasonable doubt. *United States v. Grijalva*, 55 M.J. 223, 228 (C.A.A.F. 2001). A constitutional error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Stated differently, "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). In answering this question, we consider the entire record. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

Applying this standard, we find any error surrounding the admission of propensity evidence in this case to be harmless beyond a reasonable doubt as it applies to the charged offenses involving SrA CC. Her testimony was strong and relatively consistent over time. While Appellant tried to establish SrA CC had deficient memory of the incident due to either the ingestion of prescription medication or alcohol, this attack was unpersuasive.

Additionally, our determination on harmless error is solidified by Appellant's damaging admissions, as well as photographs taken by Appellant which leaves no doubt as to his guilt on three of the four specifications involving SrA CC. With regard to the fourth specification which alleged Appellant engaged in sexual intercourse with SrA CC while she was asleep, the victim's testimony was more than sufficient to support Appellant's conviction. When also incorporating evidence of Appellant's deceptive conduct on the evening as documented by the photographs admitted against him, we are convinced beyond a reasonable doubt that propensity evidence did not contribute to the guilty verdict regarding all of the offenses involving SrA CC.

We lack the same confidence that propensity evidence did not contribute to the findings against Ms. AE. The evidence supporting the two specifications came solely from the victim's testimony and, although legally and factually sufficient, was far from overwhelming. Because Ms. AE did not verbally or physically manifest her lack of consent at the time Appellant committed the charged sexual acts, the Government attempted to show lack of consent based on previous conversations between the victim and Appellant as the types of sexual activity the victim was willing to engage in during their relationship. While the Government used testimony of its psychological expert in an attempt to explain Ms. AE's inability to manifest her lack of consent at the time Appellant exceeded the parameters of their otherwise consensual sexual activity, this evidence is not enough for us to declare the findings for these two specifications were free from the influence of propensity evidence.

Based on our determination, we must set aside the findings of the Additional Charge and its specifications involving Appellant's misconduct against Ms. AE.

## Grostefon *Claims by Appellant*

### 1. *Unreasonable Multiplication of Charges*

Appellant argues his convictions for sexual assault and abusive sexual contact equated to an unreasonable multiplication of charges. In so claiming, Appellant suggests he could not have completed the penetration offense charged as sexual assault without first touching SrA CC's genitalia, inner thigh, and buttocks.

"[T]he prohibition against unreasonable multiplication of charges has long provided courts-martial and reviewing authorities with a traditional legal standard—reasonableness—to address the consequences of an abuse of prosecutorial discretion in the context of the unique aspects of the military justice system." *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001). Rule for Courts-Martial 307(c)(4) is the current regulatory expression of that prohibition, directing that "[w]hat is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." The principle provides that the Government may not needlessly "pile on" charges against an accused. *United States v. Foster*, 40 M.J. 140, 144 n.4 (C.M.A. 1994), *overruled on other grounds by United States v. Miller*, 67 M.J. 385, 388–89 (C.A.A.F. 2009).

Our superior court has endorsed the following non-exhaustive list of factors in determining whether unreasonable multiplication of charges has occurred:

> (1) Did the [appellant] object at trial that there was an unreasonable multiplication of charges and/or specifications?
>
> (2) Is each charge and specification aimed at distinctly separate criminal acts?
>
> (3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?
>
> (4) Does the number of charges and specifications [unreasonably] increase the appellant's punitive exposure?
>
> (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

*Quiroz*, 55 M.J. at 338–39 (citations and internal quotation marks omitted).

Applying these factors, we find no unreasonable multiplication of charges in this case. We first note Appellant did not raise an objection at trial. Additionally, Appellant's own statements admitted through pretext conversations made it clear the two offenses took place at different times during the evening. As this evidence, we believe, shows the specifications were focused on distinct criminal acts by Appellant, we decline to find the offenses against him were unreasonably multiplied.

*2. Release of Victim's Mental Health Records*

As part of the discovery process, the Defense requested the Government produce the mental health records of SrA CC. The Government, citing Mil. R. Evid. 513, declined to produce SrA CC's records for Defense review. Thereafter, the Defense requested the military judge perform an in-camera review of the records to determine whether they were subject to release.

After reviewing the records in camera and conducting the required hearing under Mil. R. Evid. 513, the military judge released some of SrA CC's mental health records to the Defense. The records not released to the Defense were sealed and attached to the record of trial as an appellate exhibit.

Appellant now argues the military judge erred in not releasing SrA CC's records in total. "We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Jenkins*, 63 M.J. 426, 428 (C.A.A.F. 2006) (citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)).

Mil. R. Evid. 513 addresses the disclosure of psychotherapist-patient records. Generally, this privilege provides that

> [a] patient has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made between the patient and a psychotherapist or an assistant to the psychotherapist, in a case arising under the Uniform Code of Military Justice, if such communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition.

Having reviewed the records withheld by the military judge, we do not find there is a reasonable probability that, had the evidence been disclosed, the result of Appellant's trial would have been different. As such, we decline to grant relief.

*3. Submission of a Victim-Impact Statement in Clemency*

Appellant was initially charged with assault for infecting all three of the charged sexual assault victims with a sexually transmitted disease (STD). During the Article 32, UCMJ, 10 U.S.C. § 832, investigation, the investigating officer received evidence from the victims that they were free of STDs prior to sexual activity with Appellant. The victims also noted they tested positive for STDs after sexual activity with Appellant, and that they had not engaged in sexual activity with anyone other than Appellant during this time. The investigating officer also received evidence from Appellant's medical record of his STD diagnosis in 2011, as well as testimony from one of the victims that Appellant informed her that he was infected with an STD in early 2013. Based on the evidence, the investigating officer recommended the assault specifications be referred to trial.

Notwithstanding the investigating officer's recommendation, the staff judge advocate (SJA) recommended against referral of these assault specifications. This recommendation was based on his belief that, while there was sufficient evidence Appellant transmitted a STD to the victims, the Government would be unable to prove Appellant knew he was infected with an STD when he assaulted the three victims. The SJA did not address the testimony of one of the victims regarding Appellant's admission, but instead only referenced the lack of information in Appellant's military medical record to support this specific element of the charged offenses. The convening authority concurred with the SJA's pretrial advice and declined to refer these three assault specifications to trial.

During clemency, one of the victims submitted a victim-impact statement for the convening authority's consideration. *See* R.C.M. 1105A. In addition to discussing the impact Appellant's sexual assault had on her, the victim informed the convening authority she was personally convinced Appellant transmitted a STD to her during the sexual assault. The victim acknowledged this assault charge was not referred to trial due to the Government's inability to prove the offense beyond a reasonable doubt. Appellant now claims the convening authority's consideration of this statement was error.

This victim-impact statement was provided to Appellant and his trial defense counsel as an attachment to the staff judge advocate's recommendation (SJAR). Trial defense counsel addressed the statement in his SJAR response, noting there was insufficient evidence to support the victim's claim. This lack of evidence, trial defense counsel noted, resulted in the withdrawal of the assault charge against Appellant. Trial defense counsel argued the STD allegation was not relevant to Appellant's case and should not be considered by the convening authority when deciding to grant clemency.[14] Appellant provided a similar attack of the victim's allegation in his clemency response.

---

[14] The staff judge advocate (SJA) did not comment on trial defense counsel's claims regarding the convening authority's consideration of the victim-impact statement. Rule for Courts-Martial (R.C.M.) 1106(d)(4) provides that an SJA is obligated to state whether, in the SJA's opinion, corrective action on the findings or sentence should be

Whether post-trial processing was completed properly is a question of law, which this court reviews de novo. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citing *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)). When reviewing post-trial errors, we recognize the convening authority is an appellant's "best hope for sentence relief." *United States v. Lee*, 50 M.J. 296, 297 (C.A.A.F. 1999) (quoting *United States v. Bono*, 26 M.J. 240, 243 n.3 (C.M.A. 1988)). The convening authority, not a court of criminal appeals, is empowered to grant clemency for equitable reasons. *United States v. Nerad*, 69 M.J. 138, 145 (C.A.A.F. 2010). "Because of the highly discretionary nature of the convening authority's action on the sentence, we will grant relief if an appellant presents 'some colorable showing of possible prejudice.'" *Kho*, 54 M.J. at 65 (quoting *United States v. Wheelus*, 49 M.J. 283, 289 (C.A.A.F. 1998)); *see also United States v. Scalo*, 60 M.J. 435, 436–37 (C.A.A.F. 2005).

Article 60, UCMJ, 10 U.S.C. § 860, provides the statutory framework by which a convening authority takes action on the findings and sentence of a court-martial. The provision was amended to include a new subsection (d) that authorized the submission of victim-impact statements. *See* National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66, § 1706, 127 Stat. 960–61 (2013). However, based on the dates of Appellant's charged offenses, this provision was not applicable in this case.[15]

We do not find it was error for the convening authority to consider the victim-impact statement submitted in this case as he was free to consider these matters even before Article 60, UCMJ, was amended. The addition of subsection (d) did not open the aperture on what a convening authority could consider in clemency as existing authorities already provided a convening authority broad discretion to determine what to consider during the clemency process. *See* R.C.M. 1107(b). Before taking action in this case, the convening authority had to consider the result of trial, SJAR, matters submitted by the accused under R.C.M. 1105 or, if applicable, matters submitted under R.C.M. 1106(f). R.C.M. 1107(b)(3)(A).[16] Additionally, a convening authority may consider "[s]*uch other matters as the convening authority deems appropriate.* However, if the convening authority considers matters adverse to the accused from outside the record, with knowledge of which the accused is not chargeable, the accused shall be notified and given an opportunity to rebut." R.C.M. 1107(b)(3)(B)(iii) (emphasis added).

---

taken when an allegation of legal error is raised in matters submitted under R.C.M. 1105 or when otherwise deemed appropriate by the staff judge advocate. The response may consist of a statement of agreement or disagreement with the matter raised by the accused. Here, we question whether trial defense counsel argument amounted to legal error. In any event, we find Appellant, given his submissions to the convening authority, did not suffer prejudice.

[15] The amendment to Article 60(d), UCMJ, 10 U.S.C. § 860(d) only applies to offenses committed on or after the 24 June 2014 effective date.

[16] R.C.M. 1107 has been amended to require that the convening authority consider any statement submitted by a victim of crime. As the offenses charged against Appellant took place prior to the Article 60, UCMJ, effective date of 24 June 2014, this amendment to R.C.M. 1107 was not applicable in Appellant's case.

Prior to taking action, pursuant to R.C.M. 1107(b)(3)(B)(iii), the convening authority was free to consider whatever matter he deemed appropriate. In accordance with this governing rule, Appellant was given notice through the SJAR of the material the convening authority would consider. Appellant was provided an opportunity to rebut this material, which he accomplished by his clemency submissions.

In finding no error in this specific case, we note a SJA may not provide a convening authority with information known to be unreliable or misleading. *United States v. Mann*, 22 M.J. 279, 280 n.2 (C.M.A. 1986). As such, as we have noted in previous opinions, SJAs and their staffs should remain vigilant, particularly when reviewing materials submitted by victims. A prudent SJA may decide it is necessary to supplement the advice contained in an SJAR or addendum, depending on the content of a victim impact statement, or take other action to prevent an accused from being unfairly prejudiced during the clemency phase.

Here, we do not believe the clemency submission was unreliable or misleading. The victim contracting an STD from Appellant was a direct physical injury from the commission of an offense in which Appellant stands convicted. While Appellant now argues on appeal the referral declination supports his conclusion there was an insufficient factual basis to support the victim's claims, the pretrial advice and Article 32, UCMJ, report of investigation actually rebuts his argument, and establishes he is not entitled to relief.

*Sentence Reassessment or Rehearing*

Having dismissed the two specifications alleged against Ms. AE, we now must decide whether we can accurately reassess Appellant's sentence, or instead we must return this case for a rehearing.

This Court has "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Our superior court has repeatedly held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). In determining whether to reassess a sentence or order a rehearing, we consider the totality of the circumstances with the following as illustrative factors: (1) dramatic changes in the penalty landscape and exposure, (2) the forum, (3) whether the remaining offenses capture the gravamen of the criminal conduct, (4) whether significant or aggravating circumstances remain admissible and relevant, and (5) whether the remaining offenses are the type with which we as appellate judges have the experience and familiarity to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15–16.

Examining the entire case and applying the considerations set out in *Winckelmann*, we are unable to determine to our satisfaction that Appellant's sentence would have been at least a certain severity without the error. While this court has extensive experience in

dealing with sexual assault cases and, as such, are cognizant of the types of punishment and levels of sentence imposed for offenses similar to those alleged against Appellant, the remaining circumstances surrounding this case point towards a rehearing.

For example, the dismissal of the specifications involving Ms. AE reduced the penalty landscape and exposure by 37 years. This factor alone would not automatically require a sentence rehearing. *See Winckelmann*, 73 M.J. at 13, 16 (holding that it was not an abuse of discretion to reassess the sentence where the maximum amount of confinement decreased from 115 years to 51 years). However, the reduction in confinement is far from insignificant.

More critical than the reduction in punishment exposure, however, is the fact Appellant now stands convicted of sexually assaulting only one victim. This fact removes any argument that Appellant was a serial offender, an argument developed by the Government's expert witness during sentencing when discussing factors which increase the offender's risk of recidivism. Trial counsel also highlighted the serial nature of Appellant's crimes when supporting his argument for a significant sentence.

The dismissal of these two offenses also removed another significant argument used by the prosecution during sentencing. The offenses involving Ms. AE occurred after Appellant was under investigation by AFOSI for the allegations raised by SrA CC. Trial counsel seized on this fact by arguing Appellant was obviously dangerous as he was unable to control his sexually deviant behavior even in the face of an ongoing law enforcement investigation.

Given this damaging evidence in aggravation is now not present after the dismissal of charges, we believe the reassessment of the remaining sentencing evidence in this particular case is better suited for court members and, therefore, remand the case for a sentence rehearing.

*Appellate Delay*

This case was docketed with this court on 26 March 2015, meaning a little more than 19 months have passed between docketing and this opinion.[17] As such, the appellate delay exceeds the standards set forth in *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006).

We review de novo whether an appellant was denied his due process right to a speedy post-trial review and appeal. *Moreno*, 63 M.J. at 135. In conducting this review, we assess the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the

---

[17] Appellant filed his assignment of errors on 10 May 2016, which was over 13 months after docketing with this court. The case was officially joined with the court on 7 June 2016 when the Government filed its answer to Appellant's brief. The court then heard oral argument on one assignment of error on 18 August 2016 based on Appellant's request.

length of the delay, (2) the reasons for the delay, (3) Appellant's assertion of the right to timely review and appeal, and (4) prejudice. *Id.* There is a presumption of unreasonable appellate delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. *Id.* at 142. If the appellate delay in a given case does not rise to the level of a due process violation, this court may nonetheless exercise its broad authority under Article 66(c), UCMJ, to grant sentence relief even in the absence of a showing of material prejudice. *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002).

We decline to grant relief in this case.[18] Having analyzed the four *Barker* factors, we find the delay in rendering this opinion does not constitute a due process violation. We also find that *Tardif* relief is not appropriate in this case.

We note the following facts guided our analysis on this issue: (1) this case is relatively extensive, consisting of a 10-volume record of trial with over 900 pages of transcript; (2) the court granted a stay in excess of 30 days to allow the Government to seek an extraordinary writ from our superior court to contest the release of mental health records to Appellant which had not been previously disclosed to any of the trial participants; (3) Appellant secured civilian counsel in February 2016, almost a year after docketing, and submitted three additional enlargement of time requests to allow civilian counsel to provide advice and counsel; (4) Appellant requested and was granted oral argument in this case, but oral argument could not be scheduled for more than two months due to the participants' schedules; (5) the court specified an issue based on a change in the law as prescribed by our superior court, which eventually resulted in Appellant receiving relief; (6) Appellant is still required to register as a sex offender based on our affirmance of the offenses involving SrA CC; and (7) Appellant will still be subject to a maximum punishment of at least seven years of incarceration at his rehearing.

We are confident the court has exercised its responsibility to review this case in a timely manner. Therefore, Appellant is not entitled to relief based on the fact that more than 18 months elapsed after docketing until today's opinion.

### *Sealing of Appellate Exhibits*

The military judge sealed a number of appellate exhibits by order at Appellate Exhibit L. The order specifically noted Appellate Exhibits XX through XXIV, and Appellate Exhibits XLV through XLIX would be sealed. The former exhibits addressed Mil. R. Evid. 412 matters; the latter were pretrial statements from the three charged victims. These records are not currently sealed in the original record of trial filed with this court.

Accordingly, the Clerk of the Court is directed to seal Appellate Exhibits XX through XXIV, and Appellate Exhibits XLV through XLIX in the original record of trial.

---

[18] Appellant submitted a motion on 3 October 2016 seeking to file a supplemental assignment of error on this issue. We granted this motion, but did not direct the Government to file an answer.

The Government is directed to remove these appellate exhibits from all other copies of the record of trial, as required by Air Force Manual 51-203, *Records of Trial*, ¶ 6.3.4 (27 June 2013).

*Conclusion*

The findings of guilty as to the Additional Charge and its specifications are **SET ASIDE**. All other findings as to Charge I, Charge II, and Charge III, and their respective specifications, are **AFFIRMED**. The sentence is **SET ASIDE**. The record of trial is returned to The Judge Advocate General. A rehearing is authorized as to the findings of guilt that have been set aside and as to sentence.

FOR THE COURT

KURT J. BRUBAKER
Clerk of Court

ACM 38783