**UNITED STATES, Appellee,**

v.

**Philip K. LEE, Staff Sergeant,
U.S. Air Force, Appellant.**

No. 99–0002.
Crim.App. No. 32773.

U.S. Court of Appeals for
the Armed Forces.

Submitted Nov. 9, 1998.

Decided May 12, 1999.

Crawford, J., filed a dissenting opinion.

COX, C.J., delivered the opinion of the Court in which SULLIVAN, GIERKE, and EFFRON, JJ., joined. CRAWFORD, J., filed a dissenting opinion.

For Appellant: *Colonel Douglas H. Kohrt* and *Captain Patience E. Schermer.*

For Appellee: *Captain Tony R. Roberts.*

Chief Judge COX delivered the opinion of the Court.

Appellant has petitioned this Court for a grant of review, contending that prejudicial

error occurred when the staff judge advocate (SJA) failed to discuss a recommendation by the military judge that the convening authority waive a portion of the forfeitures. Pursuant to provident pleas of guilty, appellant was convicted of multiple specifications of child sexual abuse, in violation of Articles 120, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, and 934, respectively. He was sentenced by the military judge sitting alone to a dishonorable discharge, 18 years' confinement, total forfeitures, and reduction to pay grade E–1. After reducing the confinement to 15 years under the terms of a pretrial agreement, the convening authority otherwise approved the sentence. The Court of Criminal Appeals affirmed the findings, and the sentence was approved by the convening authority.

After announcing sentence, the military judge made the following remarks:

> The court would also make a recommendation, knowing it's just in the nature of a recommendation, within approximately 14 days after the Accused goes to confinement, I know he's going to have total forfeitures anyway, but it would be a recommendation of the court that the Convening Authority set up some sort of an allotment so that the payment the Accused is currently paying to support his son be allowed for the statutory period which is, I believe, 6 months. I guess that was $300 a month. Again, I know it's only advisory and it's only a recommendation that the court can make and the Convening Authority has the power to do that.

There was no mention of this proposal in the SJA's recommendation or the addendum, and trial defense counsel did not draw it to the attention of the convening authority in his posttrial submission.

We will grant the petition for review and grant relief.

■ In light of this omission, appellant sought a new recommendation and action when his case was before the Court of Criminal Appeals. That court held that appellant could not show substantial prejudice from the error because the military judge was referring to the automatic forfeitures mandated by the addition of Article 58b, UCMJ, 10 USC § 858b. It reasoned that since appellant's crimes all occurred prior to the date Article 58b became effective, the forfeitures mandated by that provision could not be imposed. *See United States v. Gorski*, 47 MJ 370 (1997). Unpub. op. at 2. Additionally, because the sentence in this case included total forfeitures, Article 58b would not apply. In the view of the court below there were no forfeitures to waive. Thus, it declined to grant appellant any relief. *Id.* at 3.

We conclude that the Court of Criminal Appeals viewed the recommendation of the military judge too narrowly. While the military judge mistakenly believed that appellant was subject to forfeiture of all pay and allowances under Article 58b, the thrust of her recommendation was to ensure continued financial support for appellant's minor child.

Moreover, as noted above, appellant's offenses were committed prior to the effective date of Article 58b. Thus, the convening authority still had the power to remit or suspend any or all of the adjudged forfeitures under the clemency powers granted him in Article 60, UCMJ, 10 USC § 860 (1983). *Cf. United States v. Cowan*, 34 MJ 258 (CMA 1992).

■ We continue to believe that the convening authority remains "the accused's best hope for sentence relief." *See United States v. Bono*, 26 MJ 240, 243 n. 3 (CMA 1988), *citing United States v. Wilson*, 9 USCMA 223, 226, 26 CMR 3, 6 (1958). A recommendation by a military judge must be brought to the attention of the convening authority to assist him in considering the action to take on the sentence. *United States v. Clear*, 34 MJ 129 (CMA 1992). The President has specifically directed that an SJA advise the convening authority of such recommendations.[1] RCM 1106(d)(3)(B), Manual for Courts–Martial, United States (1998 edi-

---

1. This is particularly important now that the convening authority is no longer required to read the record.

tion).[2] Because the recommendation herein failed in this regard,[3] we conclude that appellant has shown good cause to grant review.

The dissent of our colleague is most troubling for two reasons.

First, this Court is a court of law. The dissent does not question that there are errors of law in this case. Rather, she relies on the proposition that "no convening authority would have changed the forfeitures based on a hope and a prayer that appellant would send the money to his ex-wife." We have searched this record of trial and have found no evidence upon which a court of law would base this conclusion. Given the wide variety of creative actions we have seen convening authorities take to assist families of convicted servicemembers, we do not share our colleague's bald assertion that "no convening authority" would be prepared to so in the instant case. *See* 34 MJ at 260.

■ Second, and perhaps more importantly, our colleague's pragmatic approach to posttrial errors, as appealing as it is, is fundamentally flawed. In *United States v. Wheelus*, 49 MJ 283 (1998), we undertook a thorough review of the cases involving posttrial errors. We established a three-part requirement for an appellant to prevail on an allegation of error on appeal: "First, an appellant must allege the error at the Court of Criminal Appeals. Second, an appellant must allege prejudice as a result of the error. Third, an appellant must show what he would do to resolve the error if given such an opportunity." *Id.* at 288. Appellant has met that burden here.

There is nothing unique about the *Wheelus* approach to the practice of law. Indeed, it is the ordinary method by which pleadings are drafted. First, allege error; second, allege prejudice as a result of the error; and third, allege what remedy would undo the prejudice.

This must be said. Errors in posttrial processing reflect defective staff work. Such errors are fundamentally different from the errors resulting from the intense, dynamic atmosphere of a trial. We do not accept the notion that commanders are well served by staff work that is incomplete or inaccurate. No reasonable Air Force commander would accept such defective work from the flight operations or logistics officer on his or her staff, and we should not expect commanders to make decisions based upon defective staff work from their staff judge advocates.

■ Quite frankly, records that come to the Courts of Criminal Appeals with defective staff work are simply not ready for review. When such errors are brought to our attention or to the attention of the Courts of Criminal Appeals, the record should be returned promptly to the convening authority for preparation of a new SJA recommendation and action. Otherwise, the errors should be corrected immediately by the Courts of Criminal Appeals, as envisioned in *Wheelus*. We believe the better practice is to return the records of trial to the convening authority. It is that official's statutory duty, not ours, to consider what action is appropriate in the circumstances.

The petition for grant of review of the decision of the United States Air Force Court of Criminal Appeals is hereby granted on the issue raised by appellate defense counsel.

The decision of the United States Air Force Court of Criminal Appeals and the action of the convening authority are set aside. The record of trial is returned to the Judge Advocate General of the Air Force for submission to a general court-martial convening authority for a new recommendation and action. Thereafter, Articles 66 and 67(a), UCMJ, 10 USC §§ 866 and 867(a)(1994), respectively, will apply.

CRAWFORD, Judge (dissenting):

Appellant was charged with rape, forcible sodomy, and indecent acts with a 12–year

---

2. This requirement was added in 1995 (*see* Manual, *supra* at A25–27 and A25–34), well before the recommendation and addendum were prepared.

3. We conclude that this was plain error. *See United States v. Clear*, 34 MJ 129, 132 (CMA 1992).

old. Pursuant to a pretrial agreement, he pleaded guilty to carnal knowledge, consensual sodomy, and indecent acts.

Appellant was sentenced to a dishonorable discharge, 18 years' confinement, total forfeitures, and reduction to the lowest enlisted grade. Pursuant to the pretrial agreement, the convening authority reduced the confinement from 18 years to 15 years. Based on the attached stipulation in this case, no convening authority would have changed the forfeitures based on a hope and a prayer that appellant would send the money to his ex-wife.

The majority opinion is based on the assumption that upon a waiver of the forfeitures, appellant would voluntarily pay the money to the wife who reported him after a pretextual phone call in 1997, divorced him in 1996, remarried, and now has the custody of his son. This is not an instance where the convening authority may direct the money to be sent directly to his dependent son under Article 58b(b), UCMJ, 10 USC § 858b(b), which the majority recognizes was not in effect because of the date of appellant's offenses. National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104–106, § 1122(b) (February 10, 1996).

DEPARTMENT OF THE AIR FORCE
AIR FORCE LEGAL SERVICES AGENCY
CENTRAL CIRCUIT

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | |
| | ) | STIPULATION OF FACT |
| SSgt PHILIP K. LEE, USAF | ) | |
| 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 | ) | |
| 32d Combat Communications Squadron | ) | |
| Tinker Air Force Base, Oklahoma | ) | |

It is hereby agreed, by and between the trial counsel and the defense counsel, with the express consent of the accused, that the following facts are true and admissible for all purposes in these proceedings:

1. The Accused, Staff Sergeant Philip K. Lee, is an active duty member of the United States Air Force and is presently assigned to the 32d Combat Communication Squadron, Tinker Air Force Base, Oklahoma. The Accused has been on continuous active duty since 27 Feb 87.

2. The victim in this case is Katherine (Katie) Ruth Hirzel. Katie was born on 18 Apr 80 in Houston, Texas, the natural child of Beverly and Richard Hirzel. When Katie was one year old, her mother and father divorced. When Katie was four years old, her mother married the Accused.

3. From Aug 84 until Jan 94, the Accused, Beverly Lee, and Katie lived together continuously as a family. Another child, son Philip, was born in May 89. During the years from Aug 84 until the offenses in this case, the Accused raised Katie as his daughter, and she called him "Dad."

4. The Accused was stationed at Tinker AFB in Jan 91. The family first lived in an apartment in Oklahoma City. In Aug 91, the family moved to an apartment in Midwest City, Oklahoma. In Jul 92, the family moved to a house at 9696 Oak Tree Terrace in Midwest City, Oklahoma.

5. Between Jan 93 and Jul 93, the Accused sexually abused Katie on numerous occasions. Katie was twelve years old when the abuse started and thirteen years old when it ended. The Accused's sexual contact with Katie occurred in the family home at various times when her mother was either not present or not awake. Usually, the sexual activity occurred on weekends, or in the evenings after Katie's mother had gone to sleep. Beverly Lee worked five days a week, usually from 1200 to 2000. She usually went to sleep by 2200, and often brought her young son Philip into the bed to help him get to sleep.

PROSECUTION EX __1__

6. The Accused's sexual abuse of Katie consisted variously of kissing her, fondling her, inserting his finger into her vagina, having her suck his penis (fellatio), licking her vagina (cunnilingus), and full sexual intercourse. Between Jan 93 and Jul 93, the Accused performed sex acts with Katie about eight times per month, on a total of approximately 50 different days. The Accused was not under the influence of alcohol or any other substance on any of these occasions.

7. During the period from Jan 93 to Jul 93, the Accused committed indecent acts with Katie by fondling her breasts and private parts, and inserting his finger into her vagina. These actions were done with the intent to gratify the Accused's sexual desires. The Accused performed these acts throughout this time frame. At first, these were the only sex acts he performed with Katie, along with kissing her. Soon though, he progressed to sodomy and then sexual intercourse.

8. During the period from Jan 93 to Jul 93, the Accused also had Katie suck his erect penis. This occurred on a regular basis throughout this time period. During each of these occasions, the Accused had Katie take his penis into her mouth and suck it for from three to fifteen minutes. When he was ready to ejaculate, she removed her mouth and he ejaculated into his hand.

9. During the period from Jan 93 to Jul 93, there were also times that the Accused performed cunnilingus on Katie by licking her vagina. His tongue penetrated her vagina on these occasions.

10. During the period from Feb 93 to Jul 93, the Accused had full sexual intercourse with Katie. Katie was a virgin the first time the Accused had intercourse with her in Feb 93. The first time he had intercourse with her, she complained that it hurt, but she did not bleed. The Accused had sexual intercourse with Katie approximately 45 times from Feb 93 to Jul 93. Each time, the intercourse was preceded by various indecent acts and/or acts of sodomy. Each time, the Accused inserted his penis into Katie's vagina and moved it back and forth for approximately ten minutes. He usually finished by pulling out and ejaculating into his hand. The Accused never wore a condom when he was having sexual intercourse with Katie, and did not have Katie use any form of birth control.
11. During the time period from Jan 93 to Jul 93, the Accused frequently told Katie not to tell anyone what they were doing.

12. In Jul 93, one evening after Beverly Lee had gone to sleep, the Accused was caught having sexual intercourse with Katie. The Accused had told his wife that he would be reading in the bathroom. However, when Beverly awoke momentarily, the light was not on in the bathroom. She got up, walked down the hall, opened the closed door to Katie's bedroom, and saw the Accused on top of Katie in the missionary position, engaged in sexual intercourse. When Beverly entered the room, Katie started screaming and shaking. The Accused stood up and said "Oh, God, Bev, I can't believe it." Everyone was hysterical.

13. Afterward, the Accused dissuaded Beverly from reporting the incident. He told Beverly that she could not tell anyone because it would ruin his career. He told her he would be court-martialed, that the family would be split up, that she and the children would lose their benefits,

and that the children might even be taken away from Beverly. He also told Beverly that if she told her family, it could kill her mother because of her mother's health problems.

14 Beverly never reported the incident. She did not even leave the Accused right away. It was not until Jan 94 that she moved away from the Accused to Indianapolis, taking Katie and Philip with her. Beverly filed for divorce in Sep 94. The divorce was finalized in Apr 96. Beverly was awarded custody of both children.

15. Beverly lived in Indianapolis until May 96, when she remarried. Beverly married Benny Collett and moved to Kentucky. Katie attended school in Indianapolis from Jan 94 until Dec 95. During this time, her behavior at school and around the house deteriorated. She was very rebellious, starting to associate with kids who were believed by her mother to be gang members, and talked about running away.

16. In Dec 95, Beverly talked to Richard Hirzel, Katie's natural father, about Katie's worsening behavior. Richard probed for causes, and Beverly finally broke down, admitting to him that the Accused had abused Katie. Richard suggested that Katie be sent to live with him so he could help straighten her out.

17. Katie was sent to Big Springs, Texas in Dec 95. She attended the local public school there and lived with Richard Hirzel, his wife Mary, and their two young children. Richard Hirzel attempted in good faith to obtain mental health counseling for Katie, although she did not actually disclose the abuse to him at first. Katie was referred first to Mr. Hirzel's employee assistance counseling program, but made no disclosures. She was then referred to Rape Crisis/Victim Services, where she did disclose that the Accused had abused her. However, Rape Crisis/Victim Services did not provide long-term treatment, so she was referred to a local professional named Jake Glickman. Because Mr. Glickman was male, he wanted to build rapport slowly with Katie. However, after only a few visits, the Hirzels encountered financial problems, and they could not afford to send Katie to Mr. Glickman any longer. She was then referred to Howard County Mental Health, but only saw a counselor there for a few visits.

18. Although Mr. Hirzel had been informed by Rape Crisis/Victim Services that Katie had disclosed abuse, he was also advised not to pressure her to talk to him. So he was cautious about broaching the topic. However, in approximately Jul 96, Katie did finally admit to her real father that the Accused had sexually abused her. Mr. Hirzel then called the local Child Protective Services to request investigatory/judicial action. He was led to believe that the matter would be reported to the military.

19. After several months, when nothing had happened, Mr. Hirzel made inquiries by calling the AF Office of Special Investigations detachment at Tinker AFB. An investigation was opened, and Tinker AFOSI contacted Beverly Collett. Mrs. Collett cooperated and allowed Katie to talk to the investigators.

20. On 16 Jan 97, Mrs. Collett talked to the Accused over the telephone. The call was tape-recorded by AFOSI with Mrs. Collett's consent. Mrs. Collett used a pretext about Katie

disclosing the abuse at school to obtain the Accused's admission to having sex and oral sex with Katie. During the phone call, Mrs. Collett asked the Accused what would happen if the information about his abuse of Katie was disclosed at school. The Accused responded: "Guess who's going to be doing time in Leavenworth?"

21. When the Accused was in Germany in March 1990, he had attended part of the child sexual abuse court-martial of one SSgt David Daffron, a member of his unit, the 609th Tactical Control Squadron. SSgt Daffron was convicted; however, the accused was not aware of the sentence adjudged.

22. Katie has a history of various psychological and physical problems. At age 6, Katie was found to have below average intelligence, specific learning disabilities, and some fine and gross motor disabilities. She was also diagnosed with ADD-H (Attention Deficit Disorder - Hyperactivity), now called ADHD (Attention Deficit Hyperactivity Disorder). ADHD is recognized by the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV). Katie has suffered from ADHD throughout her childhood up to the present time. The essential feature of ADHD is inattention and/or hyperactivity-impulsivity that is more frequent and severe than is typically observed in individuals at a comparable stage of development. Katie has been evaluated as a very inattentive and very hyperactive child. ADHD is usually treated with a very structured, stable environment and individual instruction and support. Medication is also used. Katie has taken Ritalin, a medication that calms down a hyperactive child and enables them to concentrate better. Katie was taking Ritalin in the morning and at lunchtime during the period of the offenses.

23. While attending school in Germany from Dec 87 to Dec 90, Katie was an extremely hyperactive child. Because of her very short attention span, Katie experienced both behavioral and learning problems in school during this time.

Katie started classes in Oklahoma in Jan 91. By Mar 91, Katie was determined to be working below grade level in all academic areas and required placement in a self-contained learning disability class.

24. In 1994, when Katie had moved to Indianapolis, a full battery of standard psychological tests including the Wechsler Intelligence Scale for Children, confirmed that Katie's full-scale IQ was 80, within a range of plus or minus 6 points. A score of 80 is considered to demonstrate mental abilities in the below average range. In addition, tests and evaluation showed that Katie's mental development was approximately three years behind where it should have been. While her chronological age at the time of this testing was fourteen years, three months, her mental age was eleven years, four months. Katie's classroom performance was considered to indicate even more difficulty than the test scores revealed. According to observations, teacher reports and testing, Katie may sustain processing difficulties in short and long term auditory memory, sequencing, attending, organization, psycho-motor integration and social perception. These specific learning deficiencies are primarily due to Katie's ADHD and low intelligence.

25. In a Feb 96 evaluation, Katie's Big Springs, Texas school determined, consistent with previous diagnoses, that Katie possessed a learning disability. Katie's adaptive behavior skills appeared to be age appropriate to the educational diagnosticians, and she was considered to understand class rules and disciplinary procedures. Nevertheless, as the school year progressed, and during the following fall semester, Katie's performance and behavior deteriorated. The Hirzels reported that during the period from Dec 95 to Dec 96, while Katie lived with them, she did poorly in school, including almost flunking several courses, acted promiscuously, and rebelled against their strictness. Katie was extremely antagonistic towards Mary Hirzel. Finally, in Dec 96, the Hirzels could not tolerate Katie's behavior any longer, and sent Katie back home to live with her mother and brother.

26. In Jan 96, Katie's mother placed her in a private Christian boarding school about 80 miles from their home in Kentucky. Katie again had serious problems at this school, and in Mar 96, she transferred to the local public school. At this time, Katie appears to be happy with the new school and is experiencing fewer behavioral problems.

27. Katie has not received any significant mental health evaluation or treatment for the abuse perpetrated by the Accused. Because her mother remarried, and Katie is not the Accused's natural or adopted child, she is no longer a military dependent, and is therefore not eligible for treatment through the military, even under the new Transitional Compensation program. Katie's mother is exploring the possibility of Katie seeing a counselor through a low-cost program available in their hometown.

28. Child sexual abuse may cause adverse psychological effects that do not necessarily manifest until adulthood and then may last a lifetime. The current literature on victimization reports the following generally recognized common negative effects, based on studies of diagnosable symptoms that show that child sexual abuse victims have a higher than average incidence of:

    (1) Sexual dysfunction, sexual promiscuity, and impaired sexual relationships.

    (2) Dysfunctional personal relationships, including inability to form or maintain normal relationships with men, and impaired ability to trust others (caused by the betrayal of trust suffered by the victim).

    (3) Substance abuse, including abuse of medications. (Victims may attempt to sedate bad feelings or memories by abusing alcohol or drugs).

    (4) Somatization (e.g., manifestation of emotional problems through physical complaints).

    (5) Low self-esteem.

    (6) Divorce rate.

    (7) Sleep disorders.

(8) Anger, including, in the case of parental abuse, anger at a non-offending parent who did not take effective action to stop or prevent the abuse.

_19 Mar 97_
DATE

KEITH J. KLEIN, Lt Col, USAF
Trial Counsel

_19 Mar 97_
DATE

ROBIN L. LEIBOWITZ, Capt, USAF
Assistant Trial Counsel

_19 Mar 97_
DATE

ERIK C. PAHL, Capt, USAF
Defense Counsel

_19 Mar 97_
DATE

DONALD C. MOBLY, Capt, USAF
Defense Counsel