# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 39895**

_____

**UNITED STATES**
*Appellee*

v.

**Cody W. STEFANEK**
Senior Airman (E-4), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 5 May 2021

_____

*Military Judge:* Matthew D. Talcott (arraignment); Charles G. Warren.

*Sentence:* Sentence adjudged on 13 December 2019 by GCM convened at Goodfellow Air Force Base, Texas. Sentence entered by military judge on 11 February 2020: Bad-conduct discharge, confinement for 24 months, forfeiture of all pay and allowances for 24 months, reduction to E-1, and a reprimand.

*For Appellant:* Major Megan E. Hoffman, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Jessica L. Delaney, USAF; Major Kelsey B. Shust, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and ANNEXSTAD, *Appellate Military Judges.*

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge MINK and Judge KEY joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

ANNEXSTAD, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, in accordance with his pleas, of one specification of absenting himself from his place of duty in violation of Article 86, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 886,[1] and one specification of unlawfully carrying a concealed weapon into his place of work in violation of Article 114, UCMJ, 10 U.S.C. § 914. Appellant was also convicted, contrary to his pleas, of one specification of kidnapping in violation of Article 125, UCMJ, 10 U.S.C. § 925. The court-martial sentenced Appellant to be discharged from the service with a bad-conduct discharge, confined for 24 months, forfeit all pay and allowances for 24 months, reduced to the grade of E-1, and reprimanded.[2] The convening authority took no action on the findings and sentence.

On appeal, Appellant raises six issues before this court: (1) whether the findings on the kidnapping offense are legally and factually sufficient; (2) whether trial counsel's closing argument was improper and amounted to prosecutorial misconduct; (3) whether the military judge abused his discretion by allowing witnesses not named on the charge sheet to testify as victims during the Government's case in aggravation; (4) whether the convening authority abused her discretion when she failed to grant Appellant's request to defer confinement; (5) whether Appellant's pretrial and post-trial confinement conditions warrant relief under the Eighth Amendment,[3] Article 55, UCMJ, 10 U.S.C. § 855, and Article 66(d), UCMJ, 10 U.S.C. § 866(d); and (6) whether Appellant's right to a speedy trial was violated.

With respect to issues (3), (5), and (6), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). As to issue (1), we find Appellant's kidnapping conviction both legally and factually sufficient. On issue (2) we conclude trial counsel erred by making an improper argument, but that the error was harmless. As to issue (4), we find sentence relief is warranted as a result of the convening authority's failure to properly consider Appellant's request for deferment of confinement in accordance with Rule for Courts-Martial (R.C.M.) 1103(d)(2), and we take corrective action as set forth in our decretal paragraph.

---

[1] All references to the punitive articles of the Uniform Code of Military Justice (UCMJ) and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The court martial sentenced Appellant to 24 months for the kidnapping offense, nine months for the concealed weapons offense, and two days for the absence without leave offense. All confinement was adjudged to run concurrently.

[3] U.S. CONST. amend. VIII.

## I. BACKGROUND

At 0800, on 1 April 2019, Appellant's supervisor and mentor, SB, sat at her office desk when Appellant came to see her carrying a long shipping box, a duffel bag, and a soda. SB was a noncommissioned officer (NCO) and the two had known each other for approximately eight months. Although Appellant's voice was faint, SB heard him say, "Can we talk? If not, I'm going to kill myself," or words to that effect. SB asked Appellant to repeat what he had just said, which he declined to do. SB asked Appellant to write "Do Not Disturb" on the whiteboard outside her door, and Appellant complied.

Appellant then reentered SB's office, closed the door, and locked the push-button knob on the inside of the door without being asked. As Appellant sat in a chair next to the door, SB then asked what was in the box, and Appellant told her he had a shotgun. SB asked to see it, and Appellant partially removed the gun from the box. SB did not know if it was loaded and had thoughts that she would not make it out of her office or see her family again. Appellant related that he would kill himself if she did not talk with him or if there were any interruptions.

SB had a "long talk" with Appellant and did not feel free to leave even as she needed to use the restroom. During their conversation, SB attempted to contact others outside the office by asking for Appellant's permission to contact MG, an NCO junior in grade to SB, who was scheduled to come to her office, and to tell him not to come. Appellant gave her his permission to contact MG. MG contacted SB on her cell phone, and SB was able to message him at 0809 to say that Appellant was in her office and had locked the door. This was the first time that she notified anyone that she was being held against her will because Appellant was "watching [her] every move," and SB wanted to comply with his demands for no interruptions. MG immediately asked, via text message, if he should help or call someone. When SB did not respond, MG knocked on SB's office door, but no one answered. MG realized the door was locked, so he went to find the first sergeant.

At 0837, SB was able to message the first sergeant on her computer to say, "He's here." The first sergeant replied, "Who?" But SB was unable to respond. SB testified that she could not reveal anything more because Appellant was staring at her. The first sergeant called the phone in SB's office, but she felt she could only say that she was in a meeting.

Finally, at 0857, SB was able to send a text message to MG that stated "Help." SB scooted her chair out from behind her desk to be closer to the door so that she could unlock it. Appellant did not respond to her moving the chair. From where SB was now sitting, she could smell alcohol on Appellant's breath and asked if he had been drinking. Appellant acknowledged that he had been

drinking and told SB that he had mixed alcohol into the soda he was holding in his hand. Appellant then asked SB to split a regular soda with him, and she did. SB testified that her "thought process was to listen to everything [Appellant] said because [she was] locked in a room with [him]."

About 20 seconds after MG received the text message from SB, he came to her door. MG screamed "I know you're in there." At that point SB unlocked and opened the door while Appellant looked on. The next set of events happened quickly. MG entered the office, while SB moved to grab the shotgun in the box beside Appellant. Meanwhile, Appellant pushed SB away and attempted to grab the shotgun. Appellant then tried to put the shotgun in his mouth as MG and SB grabbed Appellant's hands. Both SB and MG called out for "help." Another NCO, SS, heard the commotion and came to the office, while the struggle for the shotgun continued. SB punched Appellant in the groin to try and get the shotgun and, in the process, cut her hands. Finally, the group wrestled the shotgun away from Appellant, and MG took it out of the office at which time Appellant was heard saying that he was going to "Leavenworth." The first sergeant arrived and cleared a shell from the shotgun. Appellant's commander then ordered Appellant into pretrial confinement where he remained through his trial.

In all, SB remained locked in her office with Appellant for about an hour. She testified that she felt like she could not leave. Appellant told SB that he would kill himself if there were any interruptions, and he would kill himself if she left. SB testified that she thought if she tried to leave, one of three things would happen: "That I would not make it out of the room or the member would not make it out of the room or neither of us would make it out of the room." While Appellant never told SB that he would hurt her; SB stated that she never felt free to leave because Appellant had locked and sat near the door with the shotgun. She further explained, "It's hard for me to go if someone says they are going to kill themselves [sic]." SB further testified that when the others entered the room, she "felt scared for everyone's safety in that room. [She] was scared that [the shotgun] would go off." She also worried for other people in the building and "what else might happen further, even after [she] left the room." SB also testified that Appellant was much stronger and about 50 pounds heavier than her.

At trial, Appellant testified and did not contest SB's testimony that he went to her office with a shotgun, but he disputed her contention that he held her there against her will. Appellant testified that when he went to SB's office on 1 April 2019, he told her, "I'm going to kill myself, and I would like to talk to you one last time. Can we, please, talk?" After he went inside her office, Appellant testified that he told SB, "You are not my hostage. I'm not going to hurt you or anyone else. You can leave whenever you want; but when you leave,

or if anyone else comes in, I am going to kill myself." After that, Appellant locked the door. Appellant testified that he realized it was possible SB could have thought that she was being held hostage. However, he stated that he never tried to keep her in the office, never precluded her from using her phone or computer, and never contemplated hurting anyone besides himself. Appellant testified that at one point SB had stated she needed to go to the bathroom, and although he did not tell her she could not leave, Appellant testified that he told her that there was "nothing left to talk about anyways, and [he] asked her to, please, just go." Appellant admitted that he made it clear to SB that if she left the office that he would kill himself. He also admitted that he could have left the shotgun in his car when he went to talk with SB. Finally, Appellant testified that when the office door opened, he pulled the shotgun towards his face and tried to put the barrel in his mouth.

SB testified at trial about her interactions with Appellant prior to the events of 1 April 2019. Until 4 February 2019, SB and Appellant had a friendly relationship primarily because of Appellant's friendship with her husband. It ended when SB told Appellant that they could not be friends anymore. SB testified that she had heard that Appellant had a romantic interest in her, and that she did not want to have any other interactions with Appellant outside of work because she believed he did not understand professional boundaries.

The following day, 5 February 2019, Appellant failed to report to work. He left a suicide note at his apartment and went for a drive to find a place to kill himself. As he drove, Appellant called SB; the first sergeant took her phone and put the audio on speaker mode. Appellant told the first sergeant that if he did not hand the phone back to SB, he would kill himself. The first sergeant instructed SB to stay on the phone with Appellant until he returned to base. SB testified that she told Appellant that everything would be okay because she cared about him "as any [NCO would] care about their Airmen." Eventually, law enforcement apprehended Appellant about three to four hours away from base. Appellant returned to the local area and was admitted into an inpatient mental health facility.

After his release from inpatient treatment, near the end of March 2019, Appellant and SB met with law enforcement and a few other members of their command. During that meeting Appellant gave SB a handwritten letter. Appellant wrote that SB had "done more for [him] than any other person in [his] entire life, and [that she had] only ever given [him] more reasons to live." Appellant further described how "all of the most meaningful moments" of his life had been shared with SB, including playing a board game and splitting a soda. He further wrote that "[e]very single day, [he]'d be so excited for [her] to come into work, just like a dog waiting at the door for its favorite person to return home." Appellant described how he would "do or give anything" to be

able to talk to her. According to Appellant, SB gave him reason to live and was "the person who saved [his] life." When asked at Appellant's trial whether SB thought there were threats in the letter, she testified, "It depends on how you read it."

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant asserts that his conviction on the kidnapping offense is both legally and factually insufficient. Specifically, Appellant argues that he did not hold SB against her will or exert mental coercion against her, and that he reasonably believed SB felt free to leave. Additionally, Appellant argues that the military judge impermissibly broadened the definition of kidnapping to include acts accomplished without force or the threat of force. We disagree.

### 1. Additional Facts

After the military judge found Appellant guilty of kidnapping, he entered special findings pursuant to R.C.M. 918(b) pertinent to the elements of the kidnapping offense and the affirmative defense of mistake of fact. The special findings were reduced to writing, marked as an appellate exhibit, and announced in open court.

The military judge concluded beyond a reasonable doubt that Appellant held SB against her will. On this point, he stated that Appellant made a "credible and imminent threat to commit suicide" and "that this suicidal threat and intention created mental coercion" on SB on two grounds: (1) SB felt "a moral obligation to try and prevent" Appellant's suicide; and (2) SB "subjectively, feared that [Appellant] might also harm her if she attempted to leave." The military judge further found that Appellant's suicide threat also objectively constituted mental coercion because "a person of 'reasonable moral strength' would not have felt free to leave under the circumstances when departure would evidently result" in Appellant's suicide.

The military judge noted that SB may have had possible physical avenues of escape, but he found that these avenues "had no impact on the underlying basis for the mental coercion" imposed upon SB, and therefore did not make SB's presence voluntary. To the extent that trial defense counsel argued that Appellant reasonably believed that SB stayed voluntarily, the military judge found beyond a reasonable doubt that Appellant's belief was unreasonable because "a reasonable person under the circumstances would also be aware of the moral dilemma of [SB] presented by [Appellant]'s credible and imminent suicide threat/declaration." As the military judge stated, "A reasonable person acquainted with all of the facts of this case would not disregard the moral dilemma, that leaving the room would result in [Appellant]'s immediate

suicide." The military judge also found the fact that SB could have left and was able to communicate with the "outside" world did not make Appellant's suicide threat any less credible or immediate.

Furthermore, the military judge specifically noted that SB's actions of remaining in the office with a person who says he is suicidal is consistent with Air Force Suicide Prevention Training, and also with what "a person of reasonable moral standing would do under the circumstances." Finally, he noted that "a reasonable person would not confuse remaining under moral obligation with remaining voluntarily."

**2. Law**

This court reviews issues of legal and factual sufficiency *de novo*. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes,* 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted). In considering the record, we "may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard witnesses." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1).

The test for factual sufficiency "is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are "convinced of the accused's guilt beyond a reasonable doubt." *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986), *aff'd,* 77 M.J. 289 (C.A.A.F. 2018)).

"In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington,* 57 M.J. at 399).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario,* 76 M.J. 114, 117 (C.A.A.F. 2017)). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King,* 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation

omitted). While we must find evidence is sufficient beyond a reasonable doubt, it "does not mean that the evidence must be free from conflict." *United States v. Galchick*, 52 M.J. 815, 818 (A.F. Ct. Crim. App. 2000) (citation omitted*).*

In order to prove the offense of kidnapping, the Government was required to prove beyond a reasonable doubt three elements: (1) Appellant confined SB; (2) Appellant held SB against her will; and (3) Appellant did so wrongfully. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 74.b; Article 125, UCMJ.

To hold a person "[a]gainst that person's will" means to hold the victim involuntarily. *MCM*, pt. IV, ¶ 74.c.(3). "The involuntary nature of the detention may result from force, mental or physical coercion, or from other means, including false representations." *MCM*, pt. IV, ¶ 74.c.(3). Additionally, "[e]vidence of the availability or nonavailability to the victim of means of exit or escape is relevant to the voluntariness of the detention, as is evidence of threats or force, or lack thereof, by the accused to detain the victim." *MCM*, pt. IV, ¶ 74.c.(3).

Kidnapping is a general intent crime, so its second element is negated if Appellant honestly and reasonably believed that SB remained in the office voluntarily, even if this belief was incorrect. *See United States v. Corralez*, 61 M.J. 737, 743 (A.F. Ct. Crim. App. 2005); *see also United States v. McDonald*, 78 M.J. 376, 380 (C.A.A.F. 2019) ("general intent" requires "only the general intent to do the wrongful act itself").

### 3. Analysis

We are convinced that Appellant's conviction of kidnapping SB is legally and factually sufficient. In assessing the legal sufficiency, we limited our review to the evidence produced at trial and considered it in the light most favorable to the Government. *See Robinson*, 77 M.J. at 297–98; *Dykes,* 38 M.J. at 272. We conclude that a rational factfinder could have found beyond a reasonable doubt all of the essential elements of Appellant's convicted offense. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed,* 54 M.J. at 41.

In this case, there was sufficient evidence to establish the essential elements of kidnapping beyond a reasonable doubt. The record demonstrates that Appellant wrongfully confined SB to her office for approximately one hour by his words and actions. When he arrived at SB's office around 0800, Appellant stated something to the effect that if SB did not talk to him that he was going to kill himself. SB then agreed to speak with him and asked Appellant to write "Do Not Disturb" outside her door. Appellant then entered

her office, closed and locked the door, and sat in a chair next to the door. Shortly after sitting down, he showed SB the shotgun he was carrying in a box. For almost an hour, SB attempted to get help, both overtly and covertly, while trying to ensure her own safety and that of Appellant. She was only released after her coworkers stormed her office and helped to subdue Appellant.

The record also demonstrates that Appellant overcame SB's will, mentally coercing her to stay in the office with him, because of Appellant's credible and imminent threat to use violence against himself. As the military judge found, and the evidence established, Appellant made a credible and immediate threat of suicide that created mental coercion on SB in that she felt a "moral obligation" to prevent Appellant's suicide. The power of Appellant's threat controlled SB's actions; she remained in the office for nearly an hour, did not leave the room to go to the restroom, and even asked for permission from Appellant before contacting MG. This mental coercion, created by Appellant's words and actions, was made more real by her knowledge of Appellant's previous suicide threats and the desire to help diffuse the situation like she previously had done. We agree with the military judge, that a reasonable person of "reasonable moral strength" would not have felt free to leave when departure would have resulted in Appellant's immediate suicide. We find the military judge's conclusion that SB was held against her will is well-supported by the evidence.

Additionally, the evidence also established that Appellant's threat of violence not only posed a danger to his own life because of the obvious and real potential for violence, but it also posed the risk of harm to SB and others in the office. The evidence showed that SB had a subjective fear for her own safety and the safety of others, including the safety of Appellant. Under the circumstances Appellant created, we conclude that SB's fear was objectively reasonable. SB testified that she was operating under the belief that if she left Appellant would use deadly violence against another, or himself, and that this threat overbore her voluntariness. While we also acknowledge that Appellant never directly threatened SB or anyone else, we are not persuaded that this fact demonstrates that she voluntarily remained in her office. This argument fails to recognize that under the circumstances Appellant created a situation in which SB reasonably feared for her own safety and for the safety of others. The evidence demonstrated that Appellant had been drinking, marched into SB's office with a shotgun and threatened to discharge the shotgun if she did not do as he said. SB had no reason to believe that Appellant would act predictably or rationally under the circumstances—a point Appellant himself made clear when he told SB that if she left he would kill himself, and later demonstrated when he attempted to put the barrel of the shotgun in his mouth after his coworkers entered the office and a struggle ensued.

Furthermore, we are not persuaded that the mistake of fact defense negates Appellant's criminal conduct. For any alleged mistake of fact to be a defense, the mistake must have existed in Appellant's mind and must have been reasonable under the circumstances. *See* R.C.M. 916(j)(1). Again, we agree with the military judge's conclusion that a reasonable person, under the circumstances, would be aware of the moral dilemma that SB was presented by Appellant's immediate and credible threat of suicide, and therefore it is not reasonable for Appellant to believe that she stayed in her office voluntarily. As the military judge correctly stated, "a reasonable person would not confuse remaining under a moral obligation with remaining voluntarily." In addition, Appellant's own testimony shows he understood that SB may have felt that she was not free to leave when he testified that it was possible that SB might "think she was [his] hostage," which, in turn, led him to tell her, "You are no[t] my hostage." Furthermore, SB's actions, such as asking Appellant's permission to contact MG, demonstrated to Appellant that she was not staying voluntarily. We conclude there was ample evidence for the military judge to find beyond a reasonable doubt that Appellant's mistake of fact was not reasonable and therefore was not a defense to confining and holding SB against her will.

We also note that Appellant is incorrect to suggest that the offense of kidnapping must always include force or threats of force. The *Manual for Courts-Martial* clearly explains that involuntariness can result from means other than force. *See MCM*, pt. IV, ¶ 74.c.(3) (listing force along with mental or physical coercion, and "other means," including false representation). We see no facts to support the argument that the military judge impermissibly broadened the definition of kidnapping. Appellant has cited no legal authority for his proposition, and we are aware of none. Moreover, we disagree with Appellant's contention that his kidnapping conviction was based on a nonviolent act or with no threat of violence. Ample facts exist in the record that Appellant possessed a loaded shotgun in an office where he was not authorized to have one, threatened to shoot himself with it, and only relinquished the firearm once it was forcibly taken from him by other Airmen after a physical struggle.

In sum, Appellant involuntarily held SB in her office for nearly an hour by threatening to kill himself with a shotgun he brought with him if she tried to leave. Accordingly, considering the evidence in the light most favorable to the Prosecution, a reasonable factfinder could have found beyond a reasonable doubt that Appellant kidnapped SB, and we are ourselves convinced beyond a reasonable doubt that Appellant kidnapped SB.

## B. Improper Argument

Appellant contends that trial counsel committed prosecutorial misconduct by: (1) sensationalizing Appellant's actions in a manner calculated to inflame

the passions or prejudices of the factfinder; (2) improperly "vouching" for SB; and (3) improperly asking the factfinder to put himself in the victim's place. Appellant asks this court to dismiss the kidnapping charge with prejudice and reassess Appellant's sentence. We agree with Appellant that the trial counsel erred in one respect—by sensationalizing Appellant's actions by "racking" the shotgun during his findings closing argument—but determine Appellant suffered no prejudice as a result and therefore no relief is warranted.

### 1. Additional Facts

Appellant's brief to this court highlights portions of trial counsel's closing argument that he contends were improper and proof of prosecutorial misconduct.

First, Appellant contends the following passages in the argument were improper because they were intended to inflame the passions of the factfinder. Specifically, Appellant argues that trial counsel mischaracterized Appellant as violent towards others when the Government proceeded on a theory that Appellant only ever threatened to harm himself by arguing:

> But we're not Monday morning quarterbacking this from a court far, far away from danger and fear and the reality that, probably, before she even had her first cup of coffee, she has a man in her office with a shotgun that she knows is capable and willing to harm people. She had no idea what he was going to do with that shotgun. Zero. [Appellant] may have testified that he didn't intend to hurt her, but there's no evidence before the court that [SB] knew that.

Appellant also contends that trial counsel erred by comparing his actions to a violent rape, when trial counsel argued:

> And when we're talking about what his actions meant in that moment, there is one thing, Your Honor, that points to that issue, and it's heart and it's what [Appellant] told her. "You're not my hostage." Why do you tell somebody, "You're not my hostage?" Well, probably because it's really clear that it could seem to her like she was his hostage. But, unfortunately, the logic of that is quite similar to someone committing a rape, with a gun to the women's head and saying, "You know what, you don't have to do this. You can stop anytime you want."

Additionally, Appellant asserts that trial counsel erred when he "racked" the shotgun during his closing argument, when there was no evidence that Appellant had "racked" the shotgun at all. Appellant points to the following passage from trial counsel's argument:

No, no, no, no, no. He, basically, made it clear that, "If things don't go my way, I'm going to use this." [Counsel held up Prosecution Exhibit 15, shotgun.] That's fear. This is the means to carry out the fear, and that strikes fear in the heart. This weapon – [counsel held forward shotgun] by its very nature, Your Honor, is designed to strike fear. This noise – [counsel racked the shotgun once] – is designed to strike fear in a [sic] hearts of people.

Appellant also highlights the following passages as evidence that the trial counsel improperly "vouched" for SB:

Her testimony is credible, because it's corroborated through and through [sic] multiple witnesses. The only thing lacking in this case, Your Honor, would be a GoPro that [Appellant] was wearing during the transaction itself on that morning, recording every step of what happened. . . .

Are we to believe that she manufactured a story that's not true in less than 15 minutes from when she went and told [MG] what happened? She told him exactly what happened. . . .

Lastly, Appellant contends that the following passage demonstrates that the trial counsel erred by asking the factfinder to put himself in the victim's shoes:

The very fact that [Appellant] acknowledged that she may feel like a hostage demonstrates that he knew the circumstances and appreciated the circumstances of which he created, and, again, with the means at his disposal, to carry out that threat. That's not reasonable. No reasonable person of means would say, contrary to his testimony, "Well, you came in here and you said you were going to end your life if I left; I'm gonna leave right now." No reasonable person would want death on their hands. No reasonable person would leave someone that they actually cared about as a troop and a friend for dead. And, to ask that of [SB], is unconscionable.

Trial defense counsel did not object to any of these statements or actions during the Government's closing argument. During the Defense's closing argument, trial defense counsel retrieved the shotgun, with the permission of the military judge, from the safe area of the courtroom and argued that Appellant did not "rack" the shotgun as the Government suggested in their argument. Trial counsel did not address whether Appellant "racked" the gun in his rebuttal argument.

**2. Law**

We review claims of prosecutorial misconduct and improper argument de novo; when no objection is made at trial, the error is forfeited, and we review for plain error. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). The burden of proof under plain error is on the appellant, who must establish "(1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the [appellant]." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted).

"Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *Id.* at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger*, 295 U.S. at 88) (additional citation omitted).

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel may strike hard but fair blows, but may not "inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted). In determining whether trial counsel's comments were fair, we examine them in the context in which they were made. *United States v. Gilley*, 56 M.J. 113, 121 (C.A.A.F. 2001). We do not "surgically carve out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238 (internal quotation marks omitted).

In assessing prejudice from improper argument, we analyze three factors: (1) the severity of the misconduct; (2) the measures, if any, adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction. *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citing *Fletcher*, 62 M.J. at 184). To determine the severity of the misconduct, we apply a five-factor test:

> (1) the raw numbers—the instances of misconduct as compared to the overall length of the argument; (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations; and

> (5) whether the trial counsel abided by any rulings from the
> military judge.

*Fletcher*, 62 M.J. at 184 (citation omitted).

A conviction will be overturned only "when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Id.* In assessing prejudice, the lack of a defense objection is "'some measure of the minimal impact' of a prosecutor's improper comment." *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)). "Military judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted). As part of that presumption, it follows that a military judge is able to distinguish between proper and improper argument. *Id.*

### 3. Analysis

#### a. Inflamed Passions of Factfinder

We first address Appellant's contention that trial counsel improperly sensationalized Appellant's actions to inflame the passions of the factfinder. Appellant specifically argues that trial counsel erred when he mischaracterized Appellant's actions as violent towards others, allegedly compared his actions to a violent rape, and "racked" the shotgun during his closing argument. Since trial defense counsel did not object during trial counsel's closing argument, we review the argument for plain error.

Trial counsel's argument that Appellant was "capable and willing to harm people" was appropriate argument. There was ample evidence in the record to show that SB was scared when Appellant entered her office with a shotgun, and that she feared for her own safety. In fact, SB testified that she thought she would not make it out of her office alive. This clearly established that during this incident she believed that Appellant was not only capable of harming himself but was also capable of harming her. We find trial counsel's argument was fair comment on the evidence in the case. As to Appellant's suggestion that trial counsel compared his actions to a violent rape, we do not find anything in the record to support this claim. Trial counsel did not argue that the military judge should compare this case to a violent rape. Trial counsel only used an analogy of a violent rape to make the point that coercion was not eliminated when Appellant told SB that she was not a hostage. It is worth noting that trial counsel was arguing to a military judge, and we find it unlikely that a military judge would be misled into conflating the facts here with the uncharged offense of rape based on trial counsel's analogy. Thus, we conclude these were acceptable arguments.

That said, we find that trial counsel's courtroom demonstration of "racking" the shotgun during his closing argument overstepped the bounds of propriety and fairness of a prosecutor. This act intentionally mischaracterized the evidence before the court and was the equivalent of arguing facts not in evidence. There was no evidence before the military judge that Appellant held the shotgun in front of SB or "racked" it in an effort to instill fear. In fact, there is no evidence that Appellant "racked" the shotgun at all. We therefore, conclude, that trial counsel's demonstration of "racking" the shotgun was plain and obvious error.

Finding error, we now review for prejudice. *See Fletcher*, 62 M.J. at 184. We note that the above action consisted of one isolated event, taking up one sentence in a closing argument that spanned seven pages of transcript. While trial defense counsel did not object, she did make a strategic decision to address trial counsel's actions in her own closing argument and specifically noted to the military judge that there was no evidence to suggest that Appellant "racked" the shotgun. We also note that trial counsel did not attempt to reargue this point during his rebuttal argument. In the absence of evidence to the contrary, military judges are presumed to know and follow the law. *Erickson,* 65 M.J. at 225. As part of that presumption, it follows that military judges are able to distinguish between proper and improper argument. *Id*. We do not find anything in the record to suggest that this isolated error by trial counsel somehow swayed the military judge to wrongfully convict Appellant contrary to the evidence in the case. The weight of the evidence supporting the conviction was strong and amply supports the conviction. Therefore, we find that this statement did not substantially influence Appellant's conviction, nor otherwise materially prejudice a substantial right of Appellant.

As Appellant was not prejudiced by trial counsel's argument, "he cannot have been prejudiced by the military judge's failure to interrupt the arguments . . . or the failure of his trial defense counsel to object to the arguments." *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013) (citing to *Strickland v. Washington,* 466 U.S. 668, 687 (1984)) (requiring that a defendant claiming ineffective assistance of counsel show he was prejudiced by counsel's deficient performance).

### b. Improperly Vouched for the Victim

Appellant next claims that trial counsel improperly vouched for the credibility of SB when he stated "her testimony is credible, because it's corroborated through and through [sic] multiple witnesses." He also cites trial counsel's statement, "Are we to believe that she manufactured a story that's not true in less than 15 minutes from when she went and told [MG] what happened?" Since trial defense counsel did not object during the trial counsel's sentencing argument, we review the argument for plain error.

Our review of the record indicates no inappropriate "vouching." *See Fletcher*, 62 M.J. at 180 (quoting *United States v. Necoechea,* 986 F.2d 1273, 1276 (9th Cir. 1993)) ("[I]mproper vouching occurs when the trial counsel 'places the prestige of the government behind a witness through personal assurances of the witness's veracity.'"). Here, we see no evidence that trial counsel used personal pronouns in his argument, nor did he state that he personally believed the testimony of any witness. He only argued that SB's testimony was corroborated by other witnesses and made fair comment on the unlikeliness that she would have manufactured a story in the 15 minutes between the kidnapping and her first description of the events. Trial counsel is not prohibited from arguing that a witness testified credibly. *See United States v. Chisum,* 75 M.J. 943, 953 (A.F. Ct. Crim. App. 2016) (holding it was proper argument when the Government "marshalled evidence" in closing argument to support its claim that a witness told the truth), *aff'd*, 77 M.J. 176 (C.A.A.F. 2018); *see also United States v. Andrews,* No. 201600208, 2017 CCA LEXIS 283, at *25 (N.M. Ct. Crim. App. 27 Apr. 2017) (unpub. op.) (distinguishing between improper vouching and arguing that a witness testified truthfully), *aff'd in part and modified in part*, 77 M.J. 393 (C.A.A.F. 2018). We find no error in these statements. *See* R.C.M. 919(b) ("Arguments may properly include reasonable comment on the evidence in the case, including inferences to be drawn therefrom, in support of a party's theory of the case.")

### c. Placing Factfinder in Victim's Shoes

Finally, Appellant argues that trial counsel violated the "Golden Rule" when he argued that "no reasonable person would want death on their hands. . . . and to ask that of [SB] is unconscionable." His theory is that through this argument, trial counsel asked the military judge to view himself as that hypothetical "reasonable person" and to thereby assess Appellant's actions through SB's perspective. Again, since trial defense counsel did not object during the trial counsel's closing argument, we review the argument for plain error.

We disagree with Appellant's contention that this is improper argument. It is clear after a review of the entire argument that trial counsel never asked the military judge to place himself in the position of SB. Trial counsel made a purely objective argument that the military judge should consider SB's predicament as an objectively reasonable person. This becomes more evident when one considers the entire context of the case. The defense theory was that SB was not placed in a coercive situation that overbore her free will. Trial counsel's statement rebutted this theory by arguing that, under the objective standard, these facts demonstrated that a person's will could be overborne by

a person threatening to harm himself and potentially others. Likewise, we find no error and only proper argument in this statement.

## C. Request for Deferment

Appellant's remaining assignment of error contends that the convening authority abused her discretion when she denied the military judge's recommendation to defer Appellant's confinement and also when she failed to respond to Appellant's request to defer confinement. We agree with Appellant that the convening authority erred by not responding to Appellant's deferment request.

### 1. Additional Background

On 3 December 2019, about a week before his trial began, Appellant was transferred from a military confinement facility on Joint Base San Antonio Lackland, Texas, to the Tom Green County Jail in San Angelo, Texas. Appellant was held in the Tom Green County Jail through the end of his court-martial on 13 December 2019, and he remained there until 23 December 2019, when he was transferred to the United States Naval Consolidated Brig in Charleston, South Carolina. Appellant's command was aware of substandard conditions at Tom Green County Jail. Appellant claims the substandard conditions in the civilian confinement facility exacerbated his depression and anxiety.

On 13 December 2019, the military judge convened a post-trial session to recommend that the convening authority defer any confinement until Appellant could be placed in a military confinement facility. The military judge stated:

> Pursuant to R.C.M. 1103, this court makes a recommendation that the convening authority decide to defer the term of confinement imposed against the accused until such time as the accused can be confined at a military confinement facility. The court is making this recommendation because based upon the information provided by the accused as to the conditions of confinement at the Tom Green Center, the court feels that the interest of good order and discipline would best be vindicated by placing the accused in a safe and secure military confinement facility, both for purposes of safeguarding the accused's continued mental health and for upholding the standards that military members have a right to expect, in accordance with our service regulations concerning the humane treatment of individuals while in confinement.

That same day, the convening authority was made aware of the military judge's post-trial recommendation, and on 16 December 2019, determined after

consulting with her staff judge advocate that deferment of confinement was "not appropriate." No other reasons were given. This decision was memorialized in a memorandum signed by the convening authority on 16 December 2019. On 18 December 2019, Appellant's trial defense counsel submitted a written request for deferment of confinement under Article 57(b), UCMJ, 10 U.S.C. § 857(b) and R.C.M. 1103(b). Appellant asked the convening authority to defer his confinement until such time as Appellant could be transferred to a military confinement facility. The military judge endorsed the written request. The convening authority did not respond to this request. On 30 December 2019, Appellant submitted clemency matters to the convening authority and asked that she consider "disapproving some of the confinement adjudged because of the poor conditions at the Tom Green [C]ounty [J]ail." Appellant's 18 December 2019 request for deferment was attached to his clemency submission. Specifically, Appellant requested five days of credit for each day Appellant spent at the Tom Green County Jail.

### 2. Law

We review post-trial processing issues de novo. *United States v. Zegarrundo*, 77 M.J. 612, 613 (A.F. Ct. Crim. App. 2018) (citations omitted). We review a convening authority's decision on a deferment request for an abuse of discretion. R.C.M. 1103(d)(2); *United States v. Sloan*, 35 M.J. 4, 6 (C.M.A. 1992), *overruled on other grounds*, *United States v. Dinger*, 77 M.J. 447 (C.A.A.F. 2018). A convening authority's omission does not entitle Appellant to relief unless it materially prejudiced a substantial right. *United States v. Eppes*, No. ACM 38881, 2017 CCA LEXIS 152, at *43 (A.F. Ct. Crim. App. 21 Feb. 2017) (unpub. op.) (citing Article 59(a), UCMJ, 10 U.S.C. § 859(a)), *aff'd*, 77 M.J. 339 (C.A.A.F. 2018). An appellant need only make a "colorable showing of prejudice." *United States v. Brown*, 54 M.J. 289, 292 (C.A.A.F. 2000). "This low threshold exists because the convening authority is an appellant's 'best hope for sentence relief.'" *United States v. Oliver*, No. ACM 38481, 2015 CCA LEXIS 144, at *4 (A.F. Ct. Crim. App. 15 Apr. 2015) (unpub. op.) (quoting *United States v. Lee*, 50 M.J. 296, 297 (C.A.A.F. 1999)), *aff'd*, 76 M.J. 271 (C.A.A.F. 2017).

When a member requests deferment, he has the burden of showing that his interests and those of the community in granting the deferment outweigh the community's interest in imposing the punishment on its effective date. R.C.M. 1103(d)(2). The Rules for Courts-Martial list factors the convening authority may consider in acting on a deferment request, including the nature of the offense, the sentence, the effect a deferment would have on good order and discipline in the command, and the requesting member's "character, mental condition, family situation, and service record." *Id*. A convening authority's

decision on a deferment request must be in writing, attached to the record of trial, and a copy must be provided to the appellant and the military judge. *Id.*

### 3. Analysis

We do not address Appellant's first claim that the convening authority erred by denying the military judge's request to defer Appellant's confinement, because we grant Appellant relief for the convening authority's failure to comply with R.C.M. 1103(d)(2). Specifically, we find no evidence in the record that the convening authority ever considered Appellant's 18 December 2019 deferment request. We further find no evidence that the convening authority issued a written decision or served the decision on Appellant and the military judge as required by R.C.M. 1103(d)(2).

Finding error, we turn our attention to whether the convening authority's errors materially prejudiced any of Appellant's substantial rights. Appellant claims that he was prejudiced in two ways: (1) he was "sent back to the Tom Green County Jail, which the military judge had already found did not meet the standards the military sets for its confinement facilities;" and (2) he was deprived of his right to challenge the convening authority's decision for abuse of discretion. We agree.

Under the particular circumstances of this case, we conclude Appellant has been prejudiced by the convening authority's failure to consider his 18 December 2019 request to defer his confinement, issue a written decision, and provide a copy of the decision to Appellant and the military judge. Appellant was entitled to have the military judge and this court review the convening authority's decision for abuse of discretion. As our superior court explained in *Sloan*, "[j]udicial review is not an exercise based upon speculation, and we will not permit convening authorities to frustrate the lawful responsibility of the [military Courts of Criminal Appeals] . . . ." 35 M.J. at 6–7. In this case, the convening authority seemingly ignored Appellant's 18 December 2019 deferment request and failed to communicate in writing any decision to both Appellant and the military judge, thereby frustrating this court's "lawful responsibility" to review the decision for an abuse of discretion. In short, these errors prejudiced Appellant's right to have this decision first reviewed by the military judge under R.C.M. 1104(b) and then later on appeal to this court.

We conclude that, in light of Appellant's clemency request to reduce his confinement for days spent in the Tom Green County Jail that reducing Appellant's confinement term and the period of total forfeiture of pay and allowances from 24 months to 22 months will adequately moot any prejudice resulting from the errors. *See United States v. Zimmer*, 56 M.J. 869, 875 (A. Ct. Crim. App. 2002); *see also United States v. Wheelus*, 49 M.J. 283, 288 (C.A.A.F. 1998) ("[T]he Courts of Criminal Appeals have broad power to moot

claims of prejudice by 'affirming only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved.'" (quoting Article 66, UCMJ)).

### III. CONCLUSION

We affirm only so much of the sentence as provides for: a bad-conduct discharge, confinement for 22 months, forfeiture of pay and allowances for 22 months, reduction to the grade of E-1, and a reprimand. The findings and sentence, as modified, are correct in law and fact, and no other error materially prejudicial to Appellant's substantial rights occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence, as modified, are **AFFIRMED**.[4,5]



FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[4] We note the Statement of Trial Results in this case failed to include the command which convened the court-martial as required by R.C.M. 1101(a)(3). Appellant has made no claim of prejudice, and we find none. *See United States v. Moody-Neukom,* No. ACM S32594, 2019 CCA LEXIS 521, at *2–3 (A.F. Ct. Crim. App. 16 Dec. 2019) (per curiam) (unpub. op.).

[5] Although not raised by Appellant, we also note that the entry of judgment (EoJ) fails to document Appellant's 18 December 2019 request for deferment of confinement, and the lack of convening authority's action on Appellant's request for deferment as required by R.C.M. 1111(b)(3)(A). Appellant has not claimed any prejudice as a result of this error in the EoJ, and we find none. We direct a military judge, through the Chief Trial Judge, Air Force Trial Judiciary, to have a detailed military judge correct the EoJ accordingly and prior to completion of the final order under R.C.M. 1209(b).